Gandy v. State.

27  707
29  442
27  707
33  424
27  707
36  635
27  707
42  840

## JAMES L. GANDY v. STATE OF NEBRASKA.

[FILED OCTOBER 25, 1889.]

1. **Criminal Law : CONTINUANCE.** The facts stated in an affidavit in support of a motion for a continuance, for the purposes of the motion, will be taken as true; and where sufficient facts are stated, a continuance should be granted. (*Williams v. State,* 6 Neb., 334; *Hair v. State,* 14 Id., 503, adhered to.)

2. ———: **COUNTER AFFIDAVITS,** or affidavits in resistance of an application for a continuance, made upon affidavits, should not be received. (Citations *supra.*)

3. ———: **CHANGE OF VENUE.** The statute as to change of venue in criminal cases confers upon the district court in the county where the offense was committed power to order a change of venue to an adjoining county, but such power is confined to the jurisdiction of the county where the offense was committed. *State v. McGehan,* 27 O. St., 280.)

4. ———: **PRIVATE COUNSEL.** The county attorney in a criminal prosecution may have the assistance of counsel employed on private account. (*Polin v. State,* 14 Neb., 540; *Bradshaw v. State,* 17 Id., 151.)

5. ———: **COUNTY ATTORNEY: VENUE.** Upon the removal of a criminal prosecution from the county in which the offense was committed, to an adjoining county upon change of venue, it is not the duty of the county attorney of the former county to follow the case to the latter county, but it is the duty of the county attorney of such adjoining county to represent the state in the prosecution of the case; and in such case where the county attorney of the adjoining county is under the disability of having appeared in the case as counsel for the accused, it is the duty of the court to appoint an attorney to act as county attorney in the prosecution. REESE, Ch. J., dissents.

6. ———: **JURORS: VOIR DIRE EXAMINATION.** The sole object of the preliminary examination of proposed jurors in a criminal prosecution upon their *voir dire* being to ascertain whether they have formed or expressed an opinion as to the guilt or innocence of the accused, and whether they are prejudiced for or against him, *held,* to be no error in the trial court to refuse to permit the counsel to examine such juror as to what certain remarks of

his of and concerning the accused tended to show, or whether such juror would believe the testimony of all witnesses equally alike, etc.

7. ———: WITNESSES: ADDITION OF NAMES TO INFORMATION. In a criminal prosecution the names of witnesses cannot, against objection, be added to the information without a showing that they were not known earlier and in time to give the accused notice, in season to anticipate their presence before trial. (*People v. Hall,* 48 Mich., 482.) REESE, Ch. J., dissents.

8. **Perjury**: EVIDENCE REQUIRED. In a prosecution for perjury the falsity of the testimony or oath of the accused upon which the perjury is assigned cannot be established by the testimony of one witness alone. It may be proved by the testimony of one reliable witness, and such corroborative facts and circumstances as will give a clear preponderance of the evidence in favor of the state; if such preponderence excludes all reasonable doubt of the guilt of the accused, such corroborative facts or circumstances ought, at least, to equal the testimony of a single witness. (*Gandy v. State,* 23 Neb., 436.)

9. ———: ———. The testimony of the witness referred to must be positive and unequivocal, and no amount of corroboration will be sufficient to sustain a verdict of conviction where the testimony of the witness to be corroborated is in the alternative, doubtful and equivocal.

10. **Information**: VARIANCE. In a criminal prosecution on information alleging perjury in testifying falsely as a witness to the copy of a lease of farm and crop, signed John M. T., the prosecuting witness, who testified that his name was *Jeremiah* and he was not otherwise known, *held,* that the variance was fatal to a conviction.

ERROR to the district court for Pawnee county. Tried below before BROADY, J.

*G. M. Humphrey, E. W. Thomas,* and *Darnall & Babcock,* for plaintiff in error:

The accused was entitled to a continuance. (*Ingalls v. Nobles,* 14 Neb., 472; *Billings v. McCoy,* 5 Id., 190; *Johnson v. Dinsmore,* 11 Id., 393; *Newman v. State,* 22 Id., 355; *McDaniel v. State,* 47 Am. Dec., 93; *State v. Painter,* 40 Ia., 298.) Counter affidavits against the application should

not have been received. (*Hair v. State*, 14 Neb., 204; *Williams v. State*, 6 Id., 337; *Newman v. State, supra.*) Plaintiff in error was entitled to a change of venue. (*Olive v. State*, 11 Neb., 18 ; Const., sec. 11, art 1; *State v. Mooney*, 10 Ia., 511; *State v. Ostrander*, 18 Id., 435 ; *San Antonio v. Jones*, 28 Tex., 19 ; *Ott v. McHenry*, 2 W. Va., 78.) The county attorney is a county officer (*Bell v. Templin*, 26 Neb., 249); and cannot prosecute outside his own county. (*Clough v. Hart*, 8 Kas., 494; *Huffman v. Com'rs*, 23 Id., 283.) As to the overruling of the challenge for cause: *Ensign v. Harney*, 15 Neb., 331; *Bowman v. State*, 19 Id., 527; Maxwell, Crim. Proc., 571; *Garrison v. State*, 6 Neb., 285; *Olive v. State, supra; Curry v. State*, 4 Neb., 548 ; *Carroll v. State*, 5 Id., 31. As to the indorsement of the names of the witnesses upon the information: *Gandy v. State*, 24 Neb., 723; *Stevens v. State*, 19 Id., 647; *Parks v. State*, 20 Id., 515. The variance between allegations and proof as to the name of the witness Thayer is fatal. (*Haslip v. State*, 10 Neb., 592 ; *Davis v. People*, 19 Ill., 74; *Buck v. State*, 1 O. St., 61; *Davis v. State*, 7 O., 206; 1 Bish., Crim. Proc., secs. 488, 677; 1 Chitty's Crim. Law, 216 ; *McBeth v. State*, 50 Miss., 81; Maxwell, Crim. Proc., 66, 67.)

*William Leese, Attorney General,* (*E. A. Tucker, Frank Martin,* and *Edwin Falloon,* with him), for the state:

There was sufficient time before trial, without a continuance, to procure all necessary depositions. A continuance will not be granted to obtain merely cumulative evidence. (*Tucker v. State*, 5 S. W. Rep. [Tex.], 180; *Smith v. Com.,* 4 Id. [Ky.], 798 ; *Dacey v. People*, 116 Ill., 555.) The statute clothes only the court of the county where the crime was committed with the power to grant a continuance. (*State v. Anderson*, 9 S. W. Rep. [Mo.], 636 ; *State v. Greenwade*, 72 Mo., 298 ; Maxwell, Crim. Proc., 546 ; *State v. McGehan*, 27 O. St., 280.)

COBB, J.

The plaintiff in error has brought this case on error from the judgment of the district court of Pawnee county.

On April 10, 1888, a transcript and information, on change of venue from Richardson county, were filed in the district court of Pawnee county charging that James L. Gandy, the plaintiff in error, on April 8, 1887, in a certain action for the forcible entry and detention of certain real estate in Richardson county, pending before Garret Minor, Esq., a justice of the peace of Richardson county, wherein Daniel H. Maxson was plaintiff and Samuel Powell was defendant, appeared as a witness for the defendant, and, being duly sworn the truth to testify, did then and there in a matter material to said action willfully, falsely, corruptly, and feloniously depose under oath that one John M. Thayer on February 4, 1887, at Oberlin, Kansas, executed to him, James L. Gandy, a lease for the southeast quarter of the southeast quarter of section 5, and the southwest quarter of the southwest quarter of section 4, in township 2, range 13, in Richardson county; and that said lease was delivered to John H. Beery, on February 4, 1887, and by him retained until March 21, 1887, when it was delivered to the witness; that on April 2, 1887, the witness wrote a true copy of the lease and delivered the original to said Powell, who subsequently lost the same; that the copy then and there introduced by the witness in evidence, is the copy taken by him of said original lease, to-wit:

"HUMBOLDT, NEBRASKA, February 4, 1887.

"For and in consideration of the sum of two hundred and seventy-five dollars, I hereby release unto J. L. Gandy the farm I live on, southeast quarter of the southeast quarter of section 5, and southwest quarter of the southwest quarter of section 4, township 2, range 13, for the crop season ending December 1, 1887.          J. M. THAYER.

"Witness: JOHN MARSHALL."

Whereas, in fact, said Thayer did not lease the land to said Gandy on the 4th of February, 1887, at Oberlin, Kansas, or at any other time or place execute a lease for said land to said Gandy, nor was the lease delivered to said Beery on said 4th day of February, or at any other time, and retained by him until March 21, or for any period of time; nor did said Beery deliver to said Gandy said lease on said 21st day of March, or at any time; nor did said Gandy on said 2d day of April, or at any other time, write a true copy of the same; nor did he on the 2d day of April, or at any other time, deliver the original to said Powell; nor did said Powell ever have possession of or lose the original lease; nor did John Marshall ever witness the same; nor is said pretended copy a true copy of any lease whatever; nor did the so called original lease ever have any existence; the said Gandy well knowing the testimony then and there by him deposed to be true, to be false, and thereby then and there committed willful and corrupt perjury. The second count of the information charged the plaintiff in error with the same offense in like manner and form with that stated. There was a trial to a jury, with a verdict of guilty against the defendant as charged in both counts of the information.

A motion for a new trial being overruled, the defendant was sentenced to be confined in the penitentiary of the state at hard labor for five years and pay the costs of prosecution.

The plaintiff in error by his petition and brief presents eighteen grounds of error, upon which is claimed a reversal of the judgment of the court below.

These points, or so many of them as may be found necessary to consider, will be reviewed in their order.

First—That there was an abuse of discretion in the trial court in overruling the motion of the plaintiff in error for a continuance. With this will be considered the second, or supplementary assignment to the first, that the court erred and abused its discretion in permitting the state to file writ-

ten objections and counter affidavits opposing the application for continuance.

It appears from the record, and is within the judicial knowledge of the court, that the plaintiff in error has been for the third time tried and convicted of the offense involved in this review. First, in the district court of Richardson county, where the judgment was brought up on error and reversed in an opinion of the supreme court published in 23 Nebraska Reports, 436. Upon the cause being remanded, the defendant, under the provisions of the statute, obtained a change of venue to the adjoining county of Pawnee, and was there again tried and convicted, and again the record was brought to this court, on error, and the judgment was reversed in an opinion delivered November 9, 1888, and published in 24 Nebraska Reports, 717. The mandate to the court below was filed in the district court of Pawnee county April 6, 1889. The term of that court at which the cause was again tried commenced April 15, 1889. On the third day of the term the defendant made his application for a continuance, supported by his own affidavit, and by that of E. W. Thomas, Esq., his attorney. These affidavits are voluminous and discursive, the latter containing allegations of fact scarcely permissible under the motion, but nevertheless intended as reasons and causes preventing the defendant from taking the depositions and testimony of certain witnesses, necessary to his defense, in the state of Kansas, and from procuring the attendance of witnesses at the trial in his defense. It is apparent that the affidavits contained the necessary allegations of due diligence, the inability of the defendant to procure certain depositions, or the attendance of certain witnesses at the trial, and showing the materiality of their testimony, setting forth what the defendant expected to prove and what he believed he could prove by the witnesses, and that he could not then safely go to trial without such testimony, and that he knew of no other witnesses by whom he could prove such facts. On

the same day the attorney for the state obtained leave to
file counter affidavits in resistance of the application for
continuance, and filed the affidavit of E. A. Tucker, Esq.,
county attorney of Richardson county, who appeared as
the prosecuting attorney, and of F. Martin, Esq., assistant
counsel, whose affidavits were in resistance of the motion
for continuance.    The defendant's motion, on the same day,
that the counter affidavits filed by the state be stricken from
the files, as appears from the record, was sustained.    Sub-
sequently, on the 28th day of May, at the same term, on
the further hearing of the motion for a continuance the
same was overruled, and on the same day the motion to file
the second affidavit of E. A. Tucker, Esq., district attorney,
was sustained.    From this proceeding, forward, there ap-
pears an *ellipsis* in the record.

The affidavits of F. Martin and E. A. Tucker in resist-
ance to a continuance are set out in the bill of exceptions
and immediately thereafter the following: "A motion to
file said affidavit was sustained by the court, to which the
defendant duly excepted, and on the same day, May 29,
1889, the defendant being present in person and by coun-
sel, and the state appearing by its attorney, the cause was
further heard on the second motion and the affidavits of
counsel for continuance."    No motion follows this entry,
but the affidavit of the defendant is set out, and states in
substance: That on May 24, 1889, he went to Oberlin,
Decatur county, Kansas, to procure the depositions of wit-
nesses there, and to procure witnesses to return with him
to Pawnee City, Nebraska, to give testimony for him there;
that he did not succeed in getting the depositions he de-
sired, but induced several witnesses to start with him on
the train for Pawnee City; that John King, who is an
important witness in his defense, and who lives near to
Oberlin, was deterred from giving his testimony there on
May 24, 1889, although subpoenaed for that purpose on
that day, before the commissioner, being intimidated by

County Attorney Tucker, as he stated in his affidavit herewith.

That J. A. Ralston, H. H. Whitman, William Jones, and George Thomas, who reside near to Oberlin, agreed to accompany him to Pawnee City to testify in his defense, and took transportation on the railroad train with him on May 24, 1889, at Oberlin, and went so far as Norton, Kansas, about forty miles; that he was there arrested on a criminal charge against affiant, filed against him in Thomas county, Kansas, two years prior, by the sheriff of Norton county, Kansas, and was taken off the train, and into custody upon a telegram from J. M. Griffin, of Oberlin, one of the prosecuting witnesses, whose name is indorsed on the information against affiant on which he is to be tried; that Griffin was neither sheriff, deputy sheriff, nor constable; that when affiant was arrested the witnesses, Ralston and Whitman, became frightened and left the train and disappeared and have not been seen since; the other witnesses, Jones and Thomas, also disappeared and have not since been seen; that he had already paid the witnesses for attendance at the trial set for May 27 at Pawnee City, and was detained under arrest by the sheriff of Norton county from half past five P. M. May 24 till 8 A. M. of the 25th, when he was turned over to the sheriff of Thomas county, taken to Colby in that county, and held to bail in $1,000 to appear there on June 17 following; by which the four mentioned witnesses were scattered and lost to him, and he could not get them together and procure their depositions in less time than two weeks; that he had talked with the witnesses, and knew that Ralston and Whitman would testify that on the night of February 4, 1887, at the Illinois hotel in Oberlin, they saw and read the lease made by J. M. Thayer on that day, being the same as to which he was then charged with perjury, and that there was nothing stated in that lease about one-third of the grass or hay, or one-third of the crop to be raised

on the farm of J. M. Thayer near Humboldt, being the farm in question; and would testify that the paper offered at the trial before Justice Minor as a copy of the lease was substantially correct; that Jones and Thomas, if present in court, would testify that they were present when the lease of J. M. Thayer to J. L. Gandy was read to Thayer, on February 4; that they heard it read and knew its contents, and that nothing was stated as to one-third of the grass or of the crop to be raised on the farm in question; that the paper was a lease of the farm from Thayer to Gandy during the crop season of 1887, stating that fact distinctly.

That Charles P. Johnson, residing in Harlan county, Nebraska, is an important witness in his defense; that subpœna was served on him May 15, 1889, in Webster county, to appear and testify May 27; if present he would testify that he was in Oberlin February 4, 1887, when the lease was made and knows that it was. a lease for the farm lying near Humboldt, for the crop season of 1887, and that he then heard J. M. Thayer agree to give possession of the land to J. L. Gandy on March 1, following; that Johnson was deterred from appearing as a witness, and was induced to leave the state by the threats and intimidation of J. M. Thayer, the principal witness for the prosecution against affiant.

That Jacob Gergens is an important witness; if present would testify that he was in affiant's house in Humboldt, January 15, 1888, in company with J. H. Beery, and heard Beery say that he had never read the lease or paper which he held; that shortly after affiant was arrested, in June or July in Humboldt, on the street not far from the postoffice, Beery said to Gergens that Gandy was not guilty of the charge of perjury, and that his (Beery's) evidence would clear him of the charge, and that on several occasions Beery repeated the same; that Gergens did not testify on previous trials, affiant not knowing the materiality

of his evidence; that he is now sick at home with conges-
tion and inflammation of the brain, under affiant's care as
his family physician, and not able to attend as a witness or
to give testimony.

That the testimony of all of said witnesses is material and
important for his defense, and he cannot safely go to trial
without their testimony, but with a continuance he believes
he can procure their attendance as witnesses at the trial.
He knows of no other witnesses by whom he can so fully
prove the facts stated.

The affidavit of J. M. Griffin, as deputy United States
marshal at Oberlin, Kansas, corroborates the statement of
the defendant as to his arrest and detention on May 24 and
25 by the sheriffs of Norton and Thomas counties, Kansas.
That of James L. Loar, the county attorney of Thomas
county, shows that the defendant was held to bail on the
25th of May in $1,000, to appear at Colby on June 17,
1889.

C. P. Johnson's affidavit states that he has been ac-
quainted with J. M. Thayer for more than ten years; that
he was present at Oberlin, Kansas, February 4, 1887, and
saw Thayer make a lease for the farm he lived on to J. L.
Gandy for the crop season of 1887, and heard him contract
with Gandy to give possession of the farm on the first day
of March of that year; afterwards saw the paper deliv-
ered to another to hold until Thayer could get his relin-
quishment properly fixed up by the notary public; that he
was subpœnaed as a witness for Gandy at Pawnee City,
May 27, 1889, and failed to appear for the reason that he
was informed by Thayer, at Inavale, Webster county, on
May 15, that every one who had testified for Gandy, so
far, had been indicted for perjury, and some had fled to
Canada, which put him in fear, and he concluded to leave
Nebraska rather than appear as a witness.

John King's affidavit states that he was notified and ap-
peared to give testimony at Oberlin, Kansas, May 24, 1889;

that just before going on the stand to testify he understood, through different parties, that the sheriff had orders to arrest anyone who testified that he saw Thayer make a lease to Gandy on February 4, 1887, in Oberlin, Kansas; that he was present at Calvert & Wallace's office on that date and saw J. M. Thayer make a lease of his farm for the crop season, for a timber claim, to J. L. Gandy of Humboldt, Neb.; the lease was then turned over to another, whose name he does not remember. He did not give his testimony, but secreted himself from fear of getting into trouble; that he talked with a county attorney, Tucker, who said he had charge of the prosecution and that they had indicted, so far, all in the case, and would probably indict others, advising him to be careful, and that there was plenty of evidence to convict anyone who testified to a lease having been made between Thayer and Gandy. This conversation was on May 24, 1889, near the Commercial hotel in Oberlin, just after the witness was notified to appear before the officer and give his deposition.

John A. Chapin's affidavit states that he is pastor of the Methodist Episcopal church of Humboldt, Nebraska; that Jacob Gergens is a member of his church, and is now sick and unfit for any business whatever, being confined to his house and to his bed.

In resistance of the defendant's motion for continuance the counsel for the state filed a paper purporting to be objections to continuance of the cause which was asked to be considered by the court, together with leave to file the affidavits of E. A. Tucker and J. M. Thayer, not as counter affidavits to those set out, but as evidence that Tucker never knew, saw, or spoke to King who made the affidavit, and that Thayer never saw or spoke to Johnson, nor made the statements alleged in his affidavit, as a charge of intimidating witnesses.

The affidavits of E. A. Tucker and J. M. Thayer in rebuttal, traversing those in support of the defendant's appli-

cation for a continuance, were received and filed May 28, 1889, and upon the further hearing of said motion for continuance the same was overruled.

The law is sufficiently settled in this state that counter affidavits, in resistance of the motion for continuance, supported by affidavits, ought not to be received or considered. In the case of *Williams v. State*, 6 Neb., 334, on an indictment for murder, the defendant in the trial court in support of his application for a continuance alleged in his affidavit that one George Hicks, then absent in the state of Iowa, would testify to certain facts material to his defense; that on the night before the alleged homicide Hicks staid at the house of Vroman, the father of the deceased, and that both the deceased and his father threatened to kill the defendant, and were actually making arrangements to attack him that night; and that both of them stated on the morning of the day of the alleged homicide that if defendant attempted to get his horse they would certainly kill him and made unqualified threats to kill defendant. On motion of the district attorney the court permitted the counter affidavit of the mother of the deceased to be interposed, in which she swore that she was present at the time and place stated and that no such threats against the defendant were made. The motion for continuance was overruled. Upon this the court said: "As a matter of practice we see no propriety in permitting the use of counter affidavits on a motion for a continuance. We do not think a side issue of this sort should be raised, or the truthfulness of the affidavit in support of the motion be determined in this unsatisfactory manner. And if the affidavit in support of the motion in this case were such as to show that the ends of justice required a continuance of the case to enable the accused to obtain material testimony known to exist, we should feel bound to reverse the judgment on this ground alone, regardless of the affidavit of Mrs. Vroman, even if no other error were committed."

In the case of *Johnson v. Dinsmore*, 11 Neb., 391, the language quoted was cited and approved; and again in *Hair v. State*, 14 Neb., 504, in the opinion of the court Judge MAXWELL said: "Where a motion for a continuance is based upon the grounds stated in an affidavit which accompanies the motion, the facts stated in the affidavit for the purposes of the motion will be taken as true, and if sufficient grounds are shown and reasonable diligence has been used by the party filing the motion, a continuance should be granted. The court will not permit to be filed, nor considered, counter affidavits in such case, because it will not in that proceeding permit an issue to be raised as to the truthfulness of the affidavit." It is of equal importance that impartial justice should be done as that a speedy trial should be had.

Counsel for the state, in regard to the allowing of counter affidavits against the motion, say: "Where a motion for a continuance is supported by affidavits stating all that is necessary to state, to inform the court that it would be unsafe to proceed with the trial, the rule is correct and should be maintained; but where the affidavits go outside of the facts necessary, and state falsehoods that are apparent, and falsely charge violation of law upon the officers present in court, it would seem to allow such false statements to be taken as true, without an opportunity to correct them, constituting a premium on perjury, not within the rule laid down in *Hair v. State*." I cannot agree with the counsel in this position. While, as hereinbefore intimated, the affidavits in support of the motion for continuance, especially that of the defendant, contain matter irrelevant and improper to be stated in such a presentation, yet the trial court always has the power to apply the remedy and strike from the files papers containing irrelevant or scandalous matter, or to require the parties to withdraw improper papers and allow them to be refiled only after they are reformed and purged. And this remedy

is the proper practice, without allowing the breach of the rule, by one party to the suit, to provoke an equal, if no greater, violation of law by the other. The course followed in this case cannot be sanctioned.

Third—This assignment is that the court erred in overruling the application of defendant for change of venue. Section 455 of the Criminal Code provides that " all criminal cases shall be tried in the county where the offense was committed, unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein, in which case the court may direct the person accused to be tried in some adjoining county." This section is identical with that of section 121 of the statute in force in Ohio, passed March 7, 1831, under which was tried and reported *McGehan's* case, 27 O. St., 280, cited by counsel for defendant in error.

In the opinion the court says, p. 283: "This section is appropriate legislation to enforce the bill of rights upon this question of venue, and confers jurisdiction upon the court in the county where the offense was committed to make an order that the accused may be tried in an adjoining county. When a statute directs the time when, the manner, and court that shall have jurisdiction over a subject-matter, and no provision is made for a rehearing in the same court, jurisdiction once exercised is exhausted, and a court of co-ordinate power could not, at another time and place, take jurisdiction of the same subject-matter.

"After an order for change of venue is made, the statute points out the manner and by whom it shall be executed. Section 122, Criminal Code, provides that the 'clerk of the county where the indictment was found  *  *  *  shall make out a certified transcript of all the proceedings in the case, which, together with the original indictment, he shall transmit to the clerk of the court to which the venue is changed.' This duty is required of the clerk of the county where the offense was committed, and permitted to no other."

The construction placed upon this statute by the supreme court of Ohio meets with our entire approval, and is adopted as the proper construction of our own. It being remembered that the crime of which the plaintiff in error was on trial was alleged to have been committed in the county of Richardson, and that the accused, upon his application, had been directed to be tried in the adjoining county of Pawnee by a change of venue, he had exhausted his rights and privileges under the statute, and there was no provision by which he could be tried in another county and a strange place.

Fourth—This error consists in the court's permitting the attorneys, Martin and Falloon, to assist in prosecuting the accused.

It appears from the record that on the 28th of May, 1889, the cause being heard, the defendant by his attorney entered objections in writing to the appearance of E. A. Tucker as prosecuting attorney in the case, he not being the official prosecuting attorney of Pawnee county, and also objected to the appearance of F. Martin and Edwin Falloon for the reason that neither is county attorney of Pawnee county, which objections were overruled. Upon this part of the record the plaintiff in error presents the above point, number four and also number five. This objection was a general one to the appearance in the cause of the attorneys named and applies to each of them, whether in the capacity of official prosecutors, or as assistant counsel. The right of assistant counsel or counsel employed and paid by private parties to appear on the part of the state in a criminal prosecution and assist the prosecuting attorney has been considered and decided in this court in the cases cited by counsel for the plaintiff in error, that of *Polin*, 14 Neb., 540, and *Bradshaw*, 17 Id., 151; and the right of the state to the assistance of such counsel, in such cases, is fully established.

But it is contended that as these cases arose under the

46

statute existing prior to the passage of the act of March 10, 1885, providing for the election of county attorneys, they are not precedents in this case.    The provision of statute at the time of the passage of the last mentioned act provides that "It shall be the duty of the district attorney of each judicial district to appear in the district court, at each term of the same, in each county in the judicial district for which he was elected, and prosecute and defend all actions, civil and criminal, and all matters whatsoever in which the state or county may be interested." (Comp. Stats., 1881, p. 66.) The corresponding provision now in force provides that "It shall be the duty of the county attorney to appear in the several courts of their respective counties, and prosecute and defend, on behalf of the state and county, all suits, applications or motions, civil or criminal, arising under the laws of the state, in which the state or the county is a party or interested." (Sec. 16, chap. 7, Comp. Stats., 1889.) The following additional provision is relied upon by counsel as changing the rule and taking this case out of the effect of the decisions referred to (sec. 20, chap. 7): "The county attorney may appoint one or more deputies, who shall act without any compensation from the county, to assist him in the discharge of his duties; *Provided,* That the county attorney of any county may, under the direction of the district court, procure such assistance in the trial of any person charged with the crime of felony as he may deem necessary for the trial thereof, and such assistant or assistants shall be allowed such reasonable compensation as the county board shall determine for his services, to be paid by order on the county treasurer, upon presenting to said board the certificate of the district judge before whom said cause was tried certifying to the services rendered by such assistant or assistants." (Comp. Stats., 1889, 91.)    Counsel in the brief say that "under the above section we think the assistants of the county attorney are to be regarded as his deputies, and that they must take the same oath as that of their

principal.   In the case at bar, the record shows that in the trial of the case in Pawnee county, at the request of the county attorney of Richardson county, F. Martin and Edwin Falloon were appointed to assist in the prosecution. These attorneys were employed and paid by private parties and took no oath." But it by no means appears that Martin and Falloon were deputies of the district attorney appointed under the provisions of the 20th section, but were his assistants procured by him under the direction of the district court in accordance with the *proviso* of said section, and were not required to take an official oath other than that as attorneys of the court; and the only objection which, in my mind, could be urged to their appearing in the case, and even as to that I am not certain, is that they were not procured to assist the official attorney of the proper county.

The fifth point urged is to the fact that E. A. Tucker, county attorney of Richardson county, followed the case upon the venue being changed to Pawnee county, and there assumed, and was permitted by the court to assume and conduct the prosecution over the objections of the duly elected county attorney of Pawnee county.   This objection was not very squarely made, as appears from the record.   It was not made by the county attorney in his official capacity, but was made by him together with E. W. Thomas and Captain Humphrey as attorneys for the defendant.   It does not appear with any clearness in the record at what time the firm of Humphrey and Lindsay [the county attorney] were employed or first appeared as counsel for the defendant.   It is to be presumed, however, that it was before the election of Lindsay to the office of county attorney. If I am correct in this assumption, it then appears that upon taking charge of the office of county attorney Mr. Lindsay found himself under a disability to discharge the duties of his office in respect to the prosecution of the defendant.   It does not appear that he availed himself of the

privilege of appointing one or more deputies. If he did, such deputies would probably rest under like disability, so that at the trial, so far as this case was concerned, the county of Pawnee was without a prosecuting attorney competent to prosecute the defendant. Here arises an important question as to the duty of the court in this exigency. Counsel for the state, in the brief, say : "It must be remembered that Richardson county pays the expenses of the trial, and the county attorney of that county was the proper one to try the case, when the county attorney of Pawnee could not defend the interest of the state by reason of having been employed as an attorney for the accused." I cannot agree to this proposition; certainly not in its general significance. If the fact that Richardson county " pays the 'expenses of the trial" is to be considered as entitled to weight, then it would follow that it was the duty of the county attorney of that county to control the prosecution of the case irrespective of the condition of the county attorney of Pawnee. There is certainly no express provision of statute making it the duty of a county attorney, upon the removal of a criminal cause from the county upon a change of venue, to follow the case to the adjoining county; nor any which relieves the county attorney, or any officer of the county to which such removal may be had, of his appropriate duty under the laws of the state in the prosecution of the cause to all intents and purposes as though the case had originated there.

The chapter of the statute of the state of Kansas entitled " County Attorney " is substantially the same as that of sections 15 to 27 inclusive of chapter 7 of our own laws; indeed, it is not improbable that those sections were adopted from the Kansas law. The case of *Huffman v. The Commissioners of Greenwood County*, 23 Kas., 281, cited by counsel for plaintiff in error, arose under the statute of that state, and was an action brought by the county attorney of Greenwood county against the commissioners

for services in the prosecution of one Nicholas, indicted for the crime of embezzlement as county treasurer, and who was granted a change of venue to the adjoining county of Lyon. The court in the opinion said, p. 282: "The county board seemed to labor under the impression that the services sued for were rendered as county attorney, and the trial court apparently held that, as the evidence of the defendants contradicted the testimony of the plaintiff concerning an express contract between plaintiff and the county board for the services, no contract was proved, and therefore the county was not liable. Here was error. As the services charged for were rendered in the prosecution of a case beyond the limits of Greenwood county, and as plaintiff attended personally the court outside of said county, the services for the county performed in Lyon county were beyond and outside of his duties as county attorney." From such consideration as I have been able to give the subject, I am unable to find anything in the general policy of the laws, and certainly nothing in their letter, imposing the duty or conferring the privilege upon the county attorney of Richardson county to follow this case into Pawnee, and in his official capacity take the management and control of its prosecution. It is true that the taxpayers of Richardson county had a remote pecuniary interest in the conviction of the accused; but they, in common with all the people of the state, had a higher interest in the due administration of the laws, and the meting out of impartial justice to all persons accused. This measure of justice, it had been made to appear by legal process, he would probably not obtain in Richardson county, therefore the duty, the power, and the privilege of his further prosecution of the crime charged was removed to the adjoining county of Pawnee. This removal was absolute and complete, as well from all the officers of that county, including the county attorney, as from the inhabitants as jurors and citizens. The removal imposed upon the adjoining county of Pawnee and its authorities, as well

as upon its inhabitants as jurors, the whole responsibility of prosecuting the accused; and although the people of Richardson county had still, as stated, a pecuniary interest as taxpayers in his conviction, neither the letter nor the spirit of the laws had left them any power to conserve that interest by the presence of an official prosecutor either to reinforce or to restrain the authorities of Pawnee county in the discharge of their juridical duties. But the question still remains, What was the duty of the court under these circumstances, the county attorney of Pawnee having to some extent been identified with the defense of the accused? This question I think is sufficiently answered by the language of the 21st sec., chap. 7, of the law referred to, that, "in the absence, sickness, or disability of the county attorney and his deputies, the court before whom it is his duty to appear, in which there may be business for him, may appoint an attorney to act as county attorney, by an order to be entered upon the minutes of the court, but who shall receive no compensation from the county except as provided for in section six (6) of this act. [Sec. 20 of this chapter.]" Undoubtedly the word "disability" as used was intended to cover cases of this kind. It will not be contended that had the county attorney of Pawnee been absent or sick it would have been the plain duty of the court to have appointed an attorney to act as the county attorney in this case; equally so when his disability by reason of his prior employment as attorney for the defendant appeared upon the records of the court. It may be said that this was substantially done in the permission and acquiescence of the court of the appearance and action of the county attorney of Richardson county in that capacity. It is certainly the spirit of the statute that the attorney so appointed be a resident of the county, and while an occasion might arise when there was no competent resident attorney unemployed by the defense, such was not the case in this instance.

The sixth and seventh assignments of error arise upon the overruling by the court of the defendant's challenge for cause of certain jurors, and the refusal to allow the coun- sel for defendant to put certain questions to the jurors upon their *voir dire*. It appears from the cross-examination of W. G. Lyman, a juryman, upon his *voir dire*, counsel for defendant put the

Q. Have you not within the past year made remarks about J. L. Gandy?

A. I think I have; yes, sir.

Q. Did they not indicate that your mind is biased against him?

The state's objection to the question was sustained by the court.

The cross-examination of the juror was continued at some length, and the counsel for defendant put the

Q. If I understand you correctly, you said you had not formed any opinion as to the merits of this case?

A. I have not, because I don't know anything about it.

Q. And outside of the facts and any circumstances com- ing within your knowledge, in regard to the case, is it not a fact that you have a bias against Mr. Gandy?

A. No, I cannot say that I have.

Q. Are you positively sure, and will you positively swear, that your mind is entirely free from any prejudice or bias against Mr. Gandy?

A. I will.

Taking these answers of the juror together, I do not think there was the error complained of in the overruling of the challenge for cause. The object of the question to the juryman, which was overruled by the court, was to ascertain whether or not the juror was influenced by a bias or prejudice against the accused. Whatever his answer might have been to this question had he been required to answer, it would have been subject to explanation and qualification, and had it been strictly in the affirmative, his

subsequent answers to questions put by counsel would have explained it as not indicating a bias or prejudice against the accused, for, as to both of those disqualifications, he positively swore he had neither one.

In the case of *Davis v. Hunter*, 7 Ala., 135, cited in the text of Proffatt on Jury Trials, the court held that "after the juror had stated that he was sensible of no bias or prejudice in the cause it was not proper for the court to allow any further cross-examination of the juror on that subject." Without expressing an approval of this ruling to its full extent, I am of the opinion that when it appears from the entire examination of a juror that he disclaims all bias and prejudice against the challenging party in fact, and that he so declares himself on the cross-examination, it is not error in the court to overrule the challenge made upon that ground.

The juryman, Joseph Patterson, having stated on his examination in chief to the prosecuting attorney that he knew nothing of the facts in the case; that he had never heard anything of them except that there was such a case, and that he had no opinion in regard to the guilt or innocence of the accused; and was further examined by the counsel for the defendant, and having stated that he first heard of "this trial some time during the first two weeks of this court here;" that he was at home when the first trial took place, and heard nothing about it at that time, that he knows of; has had no conversation with any of his neighbors with regard to the case; nor had he talked the matter over with other jurymen; that he was perfectly clear that he had neither formed nor expressed any opinion in regard to the case; he was then asked, "If Mr. Gandy, sitting as defendant in the court here, is presumed by you to be an innocent man?" which was objected to by the state, and the objection sustained. The examination was continued to the

Q. Can you state whether or not you have the slightest bias in your mind against Mr. Gandy?

Gandy v. State.

A. I have none.

Q. Have you none whatever?

A. No, sir.

The cross-examination continued at some length to the same effect. While I think it would have been entirely safe and proper for the court to have permitted the juror to answer the question, I am not prepared to say that it was its duty to allow, on the cross-examination, the question of presumption either in law or fact. The sole object of inquiry was the impartiality of the juror, to ascertain whether he had formed or expressed an opinion as to the guilt or innocence of the accused, and whether his mind was affected by any degree of bias or prejudice in favor of or against his prosecution. The course which the cross-examination was allowed to take fully answered these purposes.

Passing for the present the eighth objection, the ninth is based upon the overruling by the court of the challenge of the juror Ernest Lloyd. This juror on his examination by counsel for the state having replied that he was not acquainted with the defendant, but had met and knew him by sight; that he had talked with him, but not in regard to this case; that he had seen him in Birchard about three years ago, and was told that he was Mr. Gandy; that he knew nothing in regard to this case; that he had no opinion in regard to the guilt or innocence of the accused; that he had not talked with any of the attorneys about the case, nor heard them talk about it; he was cross-examined by counsel for defendant, in which he substantially reiterated his answers, and further answered in reply to the

Q. Can you state whether or not you have any bias in regard to this matter?

A. No, sir.

Q. Have you any prejudice?

A. No, sir; I have had no business to make me so.

Q. From what you have heard, hasn't it made a bias in your mind?

A. No, sir; because I don't know whether he is guilty or not.

Q. Did you ever hear any one say anything about his guilt or innocence.

A. No, sir.

Q. Do you think it would take less proof in his than in any other case?

A. No, sir; I would go according to evidence produced.

Q. You would decide on the evidence produced?

A. Yes, sir.

Q. And you would allow no other consideration but the evidence in making up your verdict?

A. Certainly not.

Q. You are positive of that?

A. I know it, but would not swear to it.    *    *    *

Q. You are perfectly sure that you have not the slightest prejudice in this matter?

A. That is what I swore to.

Q. Either against Gandy or his attorneys?

A. No, sir.    *    *    *

Q. You would give Gandy as good a show as any other person?

A. Yes, sir.

Q. You would let no outside matter influence your verdict?

A. No, sir.

Q. You may state whether you would give the same credit to what an infamous person would say on the stand as to a good reliable witness.    (Objection of the state sustained by the court.)

Q. Do you look upon the testimony of all men, after being sworn, as of the same character?

A. Certainly, if a man goes upon the stand and swears to a thing.    (Defendant challenges the juror for cause.)

By the court: You can explain yourself. If you would believe one man as quick as another, let it be known; but if you take other things into consideration, as bearing upon the probability of their story, or other opportunities of knowledge, and probabilities of truthful character, what would you mean by that?

A. I don't know any of the witnesses, and of course I would have to believe one as much as another. (The defendant again challenges the juror. The court makes no decision.)

Q. (supposed by the court): Do you mean till you know something about it?

A. Yes, sir.

Q. Do you mean that your mind is unbiased as to the evidence that may come before it?

A. Yes, sir.

Q. And in weighing the testimony of the several witnesses?

A. Of course it would be in the way the testimony comes.

Q. If the court would give you instructions on those questions, would you follow the instructions?

A. Certainly I would.

Q. Your mind is unbiased on those questions; you have no prejudice against one witness more than another?

A. I have no prejudice at all. (The defendant challenges the juror for cause, for the reason that he states " he would believe one witness as quick as another." Challenge overruled.)

As heretofore stated, the sole object of the examination of this juror was to ascertain whether he had formed or expressed an opinion as to the guilt or innocence of the accused, and whether his mind was affected by bias or prejudice for or against the accused, and not to ascertain his views in mental and moral philosophy, and the weight to be given to the testimony of witnesses by that criterion.

And, I think, there is no warrant in the law for holding him disqualified as a juror on account of the views expressed by him on any subject other than those indicated as the extent and limit of his examination.

Returning to the eighth point, the error is predicated upon the allowing by the court of the prosecuting attorney's indorsement upon the information of the names of ten additional witnesses, only one of whom was called at the trial, and not for the purpose falsely set out in the notice to the defendant. It appears that on May 21, 1889, the county attorney of Richardson county served on the defendant a notice that he would ask the court to allow him to indorse on the information against the defendant in the case to be tried May 27, 1889, at the opening of the court, the following witnesses, to be used for rebuttal or impeachment and for no other purpose whatever. The names of ten witnesses are enumerated, including that of George Marsh. No application was made to the court for that purpose until the 29th of May, after a portion of the jurymen had been selected, when the application was made and allowed against the objection of the defendant.

It appears from the record that on May 27, 1889, E. A. Tucker presented and filed a written notice directed to James L. Gandy, and which had been served on him by the sheriff, to the effect that he would ask the court to allow him to indorse upon the information the names of ten witnesses therein set out, which witnesses would only be used for the purpose of rebuttal, or impeachment, and for no other purpose whatever. It also appears that on May 29, following, the said Tucker asked and obtained leave of the court to indorse the names of said witnesses upon the information, which was done. There does not appear to have been any reason given, or showing made, why the names of the witnesses were not indorsed on the information at the time of its filing, nor does it appear that the names of the witnesses were not known to the county attorney

at the time of filing the information. But one of these witnesses was sworn. Defendant complains that this witness was sworn and examined upon the presentation of the case in chief by the state, and not on rebuttal, or upon impeachment, according to the terms of the notice. But the statute does not provide for a classification of the witnesses. If this witness's name was properly indorsed upon the information for any purpose, he was a witness for any purpose of the trial for which the state might call him.

Section 579 of the Criminal Code provides that "All informations shall be filed during term, in the court having jurisdiction of the offense specified therein by the prosecuting attorney of the proper county as informant; he shall subscribe his name thereto and indorse thereon the names of the witnesses known to him at the time of filing the same; and at such time before the trial of any case, as the court may by rule or otherwise prescribe, he shall indorse thereon the names of such other witnesses as shall then be known to him." This section has been twice construed by this court, but not in either case upon facts precisely like those of the present case. In *Park v. State,* 20 Neb., 515, we had occasion to refer to the fact that our statute governing proceedings on information was borrowed substantially from that of Michigan, where they had been construed by the court of last resort before our adoption of them. We specially cited the case of the *People v. Hall,* 48 Mich., 482, where, in an opinion published prior to our adoption of the statute of that state, the supreme court laid down the law in its syllabus that "In a criminal prosecution the names of witnesses cannot, against objection, be added to the information without a showing that they were not known earlier and in time to give defendant notice in season to anticipate their presence before trial." We again signify our approval of the principle of that case. The notable departure from the law thus expressed in the present case is that the court allowed,

against objection, the names of witnesses to be added to the information without a showing that they were not known earlier.

The tenth assignment of error is that the verdict is not sustained by the evidence. It was formerly the law that two witnesses were necessary to convict of the crime of perjury ; as was said, otherwise there would be no more than the oath of one against another, upon which the jury could not safely convict. But this strictness has long since been relaxed; the true principle of the rule being this, that the evidence must be something more than sufficient to counter-balance the oath of the prisoner, and the legal presumption of his innocence. The same effect being given to the oath of the prisoner as though it were that of a credible witness, the scale of evidence is exactly balanced, and the equilibrium must be destroyed by material and independent circumstances before the party can be convicted. (See 1 Greenl., sec. 257 ; 2 Roscoe, Crim. Evidence, * 858 ƒ.)

We have seen that the oath of the accused, which is assigned for perjury, must be contradicted by one witness, and that in addition thereto there must be at least strong corroborative evidence tending to show the falsity of the oath of the accused. It would seem upon principle that the oath affirmatively relied upon to contradict and disprove the oath of the accused must positively contradict. This would seem to be necessary in order to create that counterpoise and equilibrium between the oath of the accused and that of the prosecuting witness, which, as we have seen, must be overcome by additional or corroborating evidence before there can be a conviction. I have not been able to find any case of conviction upon oral testimony where the oath of the prosecuting witness has failed to absolutely and in positive terms contradict the statement of the accused assigned for perjury. Such being the case I have failed to find a discussion in any case of the point now under consideration.

It appears from the bill of exceptions upon the oath of Garret Minor that upon the trial before said Minor, as a justice of the peace of Richardson county, in an action then pending and being tried before him, wherein D. H. Maxson was plaintiff and Samuel Powell was defendant, the accused, James L. Gandy, was a witness for the defendant; that upon being duly sworn by the said justice of the peace the accused testified and swore that J. M. Thayer had made him a written lease· to the property in controversy in the suit then pending before the said justice of the peace; that he then and there offered what purported to be a copy of the lease, and said it was a copy of the paper given by Thayer to him; and said the lease was made at Oberlin, Kansas, and was put in the hands of Mr. Beery to be kept until called for; that Mr. Beery gave it up to him, and that he and Powell made a copy of it and that Powell took the original; he said that this (the paper which he presented) was a copy of the original lease given him by Thayer at Oberlin, Kansas, some time in the preceding February; that the Beery in whose hands the original was placed was the Rev. Mr. Beery, and the original was as follows:

"HUMBOLDT, NEBRASKA, February 4, 1887.

"For and in consideration of the sum of two hundred and seventy-five dollars, I hereby release unto J. L. Gandy the farm I live on, S. E. ¼ S. E. ¼ Sec. five & S. W. ¼ S. W. ¼ Sec. four, town two, range 13, for the crop season ending December first, 1887.        J. M. THAYER.

"Witness: JOHN MARSHALL."

The foregoing is the oath of the accused which is assigned for perjury. Is it contradicted by the oath of J. M. Thayer, whom we will designate the prosecuting witness, in that positive manner necessary to create the equilibrium, spoken of, between his oath and that of the accused? I here give his examination in chief, and so much of his cross-examination as is directed to its elucidation.

Q. Do you know the defendant, J. L. Gandy?

A. Yes, sir.

Q. Do you remember of being with him at Oberlin about two years ago?

A. Yes, sir.

Q. Was there any paper executed there by you to him?

A. Yes, sir.

Q. What was the nature and contents of it? Describe it to the jury.

A. It was an order to Mr. Beery to give up a paper he held, a bill of sale against us; also a bill of sale or written contract for one-third of the crop raised on the farm.

Q. (Handing witness Exhibit G.) I will ask you to examine that paper?

A. I don't think that is the paper.

Q. Do you say it is, or is not?

A. I think not.

Q. Did you at the time execute a paper of this kind; that is, with these words in it?

A. No, sir; I don't think I did.

Q. What was done with the paper you executed at Oberlin, Kansas?

A. It was given to Mr. Beery to hold.

Q. What Beery?

A. Elder Beery.

Q. Who was present at the time and place the paper was executed in Oberlin, Kansas?

A. My son, and William Reeves, Mr. Beery, Mr. Gandy, and one of the lawyers, either Calvert or Wallace, and myself, I think, about as near as I can tell, were the men.

Q. Do you know the description of this land, and where it is?

A. I suppose so; I lived on it.

Q. Whose land was it?

A. Mr. Hunzeker's.

Q. Was it known as the Hunzeker farm?

A. Yes, sir.

Q. How far is it from Humboldt?

A. About a mile and a half, in Richardson county, Nebraska.

Q. What claim did you have on that land, if any, at the time you were in Oberlin, Kansas?

A. I had it for a year; I had owned the land and sold it, and was to have the use of it for that season, and after March rented it to Elder Maxson.

Q. The same who testified here a while ago?

A. Yes, sir.

Q. How long was it after you gave the paper executed in Oberlin to Elder Beery until you saw it again, if you ever did see it?

A. I did not see the one I gave to Mr. Beery until about the time of the trial at Pawnee.

Q. The paper that was given to 'Squire Beery?

A. No, sir; the one given to Elder Beery was the one executed.

Q. Did you ever see that paper after you gave it to Elder Beery at Oberlin?

A. I don't think I did.

Q. Do you know what became of it?

A. No, sir; I do not.

Q. Can you tell what the contents were; what the statements of that paper were?

A. It was to deliver a bill of sale that Mr. Beery held; and he was to have one-third of the crop, including grass or hay.

Q. Was there anything else in that paper that you remember of?

A. I cannot tell you all that was in it exactly; it was —during the crop season on the place I now live on—I think are the words.

47

Q. State to the jury, if you can, how the land was described in the paper you executed at Oberlin.

A. It was described by the name of the farm I now live on.

Q. Was there any other description in it?

A. I don't think there was.

Q. To whom was that paper made?

A. To M. E. Gandy, I think.

Q. Before you went to Oberlin, state whether or not there had been any dealings between you and the defendant.

A. Yes, sir.

Q. Was there any papers drawn?

A. Yes, sir.

Q. To whom?

A. My theory is that I executed the paper to Mrs. Gandy before I went, and in Oberlin we executed another paper to her. I think they were drawn to M. E. Gandy, to the best of my recollection.

Q. Do you recollect of their having a trial before Justice Minor concerning the right of Mr. Maxson to that land in Humboldt?

A. I heard there was.

Q. Do you know of such a circumstance?

A. I heard of it.

Q. After that trial tell the jury whether or not you had any conversation with the defendant about this matter.

A. I don't think I did after the trial.

Q. After the suit was — do you remember of having a conversation with Dr. Gandy, the defendant at one time, about this case we are now trying?    (Objected to and question withdrawn.)

Q. After you left the vicinity of Humboldt, Nebraska, where did you move to?

A. To Marshall county, Kansas.

Cross-examined:

Q. What is your name?

A. Jeremiah; I think I told you J. was for Jere, and M. for miah.

Q. You sign your name J. M.?

A. Yes, sir; I take those letters for convenience.

Q. Where do you live now?

A. In Webster county, Nebraska, since March last; before that in Marshall county, Kansas, for about two years.

* * *

Q. When did you leave Nebraska to go to Kansas?

A. I think it was about the 22–3 of March, 1885.

Q. You say you had made a paper to Gandy or his wife in Humboldt and that paper gave them what?

A. Yes, sir; it was a bill of sale for the crop, that is, one-third of the crop, and some stock we were to give him for three timber claims.

Q. To be raised on that Hunzeker farm?

A. I was to farm it myself and live there.

Q. Did the paper say so?

A. No, I don't think it did.

Q. The paper simply said it was for one-third of the crop to be raised on that farm?

A. Yes, sir.

Q. What kind of a crop did you allude to?

A. It didn't say ; only grass or hay.

Q. That crop was not in the ground at that time?

A. No, sir.

Q. You think it was about the 3d of February?

A. I think it was.

Q. And you went to Oberlin that night?

A. Yes, sir; I think it was the same evening.

Q. You and your son-in-law?

A. Yes, sir, and Mr. Beery.

Q. On the fourth day of February were all of you parties in the office of Calvert and Wallace in Oberlin, Kansas?

A. Yes, sir.

Q. Was Gandy there?

A. Yes, sir.

Q. Were you there?

A. Yes, sir.

Q. Did you know Calvert and Wallace?

A. No, sir, I did not know either one of them; I think I have seen Calvert since, here, probably.

Q. Was Calvert in the office at that time?

A. Yes, sir.

Q. They were doing a land office business there; people were taking timber claims and making other entries at that time?

A. Yes, sir.

Q. And you made a paper in the office of Calvert and Wallace on that 4th day of February?

A. Yes, sir.

Q. Who drew it up?

A. I think Mr. Gandy wrote it up.

Q. Did he write it on a blank of any kind, or just on a sheet of paper?

A. Just on a sheet of paper, I think.

Q. It wasn't a blank lease or anything of that kind with writing on it, was it?

A. I don't think it was.

Q. Do you know where he got it?

A. No, I suppose he got it there in the office; I don't know anything about it.

Q. State again what it was — was on that paper.

A. It was an order for a bill of sale that Mr. Beery held.

Q. That was directed to Mr. Beery?

A. No, sir, I don't think it was; I don't know whether it was directed to him or not; Mr. Beery took the paper and held it.

Q. I want to know what was on the paper; you say there was an order to B. F. Beery, please deliver, and so forth; was that the way it was written?

A. I think likely it was written that way.

Q. To deliver what?

A. That bill of sale that was madé the day before.

Q. To whom?

A. Mr. Gandy.

Q. Which part of the paper was that on?

A. I think it was on the upper part.

Q. What else was on the paper?

A. It was to give him one-third of the crop raised on my farm, including grass and hay.

Q. Isn't it a fact that the order to B. F. Beery was on the lower part of the paper and the other you speak of on the upper part?

A. I think not; I would not be sure, but I think not.

Q. Who signed the paper about one-third of the crop, including grass and hay?

A. I did.

Q. How did you sign your name?

A. I think I signed it J. M. Thayer.

Q. Who signed the lower part?

A. I, and my son, and son-in-law.

Q. And that was given to whom?

A. Elder Beery.

Q. And you never saw it afterwards till when?

A. I don't think I ever saw it; I am not certain about it.

Upon examining this evidence of the prosecuting witness, it will be seen that upon being shown the paper which the accused had sworn was a copy of a lease executed by the witness to him, and his attention being called to the time and place at which the accused had testified that the original was executed and was asked the question, "Did you at the time execute a paper of this kind; that is, with these words in it?" He answered, "No, sir; I don't think I did." This answer of the witness constituted but one sentence, and all of its parts are to be taken together, and so taken together it falls far short of a positive assertion that at the time re-

ferred to he did not execute a paper like the one exhibited to him.   In other words, that he did not execute the original of which that paper was a sworn copy.   This witness had previously, upon plaintiff's Exhibit G being handed to him and asked to examine it, answered, " I don't think that is the paper ;" and being asked the direct question, do you say it is, or is not, answered, "I think not."   No further attempt was made to directly contradict the statement of the accused that the paper was a copy of an original lease executed to him by the witness there.   But the attorney representing the state here directed the attention of the witness to a certain paper which the witness had already testified that he had executed at Oberlin, Kansas.   He is asked what he did with that paper, who was present at the time and place of its execution, and also to describe and locate the land referred to in it ?   All these questions·he answered, and by his answers probably laid the foundation for the introduction of other evidence tending to disprove the statement of the accused that the paper held by him was a copy of that executed by the witness Thayer, referred to, but did not tend to contradict the statement of the accused that said paper was a copy of a lease executed to him by the witness Thayer.   To state it in other words : The substantive statement, made by the accused under oath, upon which perjury is assigned, was that J. M. Thayer, the prosecuting witness, had executed a lease to him of a certain farm.   Thayer is produced as a witness to convict the accused of perjury in the making of that statement on oath. He is examined directly as to the truth of the statement, but does not absolutely contradict it.   A paper is shown him which the accused had testified was a copy of the lease and he is asked to examine it.   He seems to have anticipated the question whether it was a copy of a lease which he had executed to the accused and answered it, but, instead of answering in terms of negation, he replied, "I don't think that is the paper;" and again, upon being

asked do you say it is, or is not, instead of replying in terms positive, he answered, " I think not;" and again upon being asked, " Did you at the time execute a paper of this kind, that is, with these words in it?" he answered, " No, sir; I don't think I did." It may be observed that even a positive answer in the negative to this last question would have been that of a negative pregnant. He was not even asked in direct and positive terms, without limitation as to time, whether he had executed a paper of the character of that shown him, or that of the one with " these words in it." But even in the objectionable form of the question, as put, his answer was equivocal. It is worthy of observation that the witness is nowhere asked the direct question whether he had at all executed a lease to the accused, and that he nowhere in his testimony stated directly, and in positive terms, that he had not executed a lease, to the farm in question, to the accused.

The conclusion is manifest, then, without entering upon the consideration of the question of corroborative evidence that the positive evidence of the falsity of the oath of the accused which is assigned for perjury is not directly proven even by the oath of one witness; and that no amount of merely corroborative proof would be sufficient to sustain the verdict.

I will now call attention to the fifth instruction of the court to the jury, though the error complained of is made the substance of the eleventh assignment:

" 5. The jury are instructed that the law presumes the testimony of the accused as the testimony of one credible witness in his own favor, and sufficient to counteract the testimony of one credible witness, swearing positively in contradiction of the accused's oath; so that the testimony of J. M. Thayer, on the part of the state, and the testimony of the accused as set forth in the information (if the jury regard said Thayer as a credible witness) leave the evidence as between the state and the accused equally bal-

anced; and before the accused could be convicted the state must furnish evidence in corroboration of said Thayer to cause the scale of evidence to preponderate in favor of the state; and such corroborative evidence must be equal in force and effect to the evidence of another credible witness; and if in view of the above rule the state has failed to prove the truth of the material allegations of the information, beyond a reasonable doubt, the accused is entitled to an acquittal."

The court below erroneously assumed in this instruction that there was before the jury the testimony of one credible witness (if the jury regarded Thayer as such), swearing positively in contradiction of the accused's oath, so that, in that case, the testimony of J. M. Thayer, on the part of the state, and that of the accused, as set forth in the information, leave the testimony as between the state and the accused equally balanced and of equal weight.

This instruction was erroneous and misleading; for we have seen that the evidence of Thayer left the important and essential facts contained in the testimony of the accused, given before Justice Minor, and set out in the information, not positively contradicted.

The eleventh assignment, as above stated, presents errors based principally on the 1st, 2d, 4th, 5th, 6th, and 9th instructions to the jury. It is not deemed important, after what has been said on other questions, to consider each of these points. But in the fourth instruction it was given substantially to the jury that if they found the true name of J. M. Thayer, from whom, it is charged in the information, that the accused falsely testified he obtained the lease, is not John M. Thayer, as alleged in the information, and should further find that his true name was Jeremiah Thayer, but is known as J. M. Thayer and so signs his name, and as a matter of fact is the J. M. Thayer named in the information as the identical man from whom it is charged the accused testified he obtained the lease, they

were instructed that the averment in the information was not a fatal variance.

To this instruction exception is taken that the misnomer of *Thayer*, as the party injured in the charge against the accused, is a fatal variance between the allegations of the information and the evidence of record. To support this point the testimony of the witness Thayer is cited in his examination in chief, that "his name is *Jeremiah* Thayer; that he does not think he is commonly known by any other name, and that he is not known nor called and does not respond to any other name." It is claimed upon this evidence that the variance, contrary to the charge of the court, is such as to interpose against a conviction. In support of this view the authority of *Bishop* is cited, Crim. Proc., sec. 488, that "*descriptive matter* must always be proved as laid; the name of a person, corporation, or firm must be proved as laid; any material variation being fatal;" and in sec. 477: "a mistake in the name of a third person, in a material allegation, will be fatal at the trial; for it creates a variance between the allegations and proof." To this may be added the authority of Maxwell in Crim. Proc., p. 66-7, that "the names of parties injured and third persons should be stated correctly when known;" and "where an indictment stated the firm name of partners owning a house burglarized, and the property therein, and identified the firm by naming the individual members, proof that the property belonged to the firm without proof of the Christian names of the members of the firm will not sustain the indictment." Both authors agree, and set forth distinctly, that the variance under the analogies of this prosecution is fatal to conviction. This rule has not been recently discovered, nor since the times of Archibald, Chitty, and East, but before their day. Other authorities are cited by counsel of reversals after conviction on the same grounds, but are not deemed essential to encumber a lengthy opinion with.

There are other important errors assigned not treated here, and as there must be further proceedings, and as this opinion has reached its full length, they will not be reported.

The judgment of the district court is reversed and the cause remanded to that court in accordance with law.

REVERSED AND REMANDED.

MAXWELL, J., concurs.

REESE, CH. J., dissenting.

I cannot agree to all the conclusions of my associates, expressed in the opinion in this case, and will briefly state my reasons therefor.

1. While the statute is silent as to the duties of county attorneys in criminal cases, where the venue is changed, yet I do not think it was the purpose of the legislature to *deprive* the county attorney of the county from which the change is taken, of the right or authority to appear in the district court of the county to which the cause is removed, and of which court he is an officer, and prosecute persons accused of crimes alleged to have been committed in the county of which he is the attorney. While it is true that this is not shown to be a case in which there was no competent attorney of Pawnee county who might have been appointed as county attorney for *that* county for the purpose of prosecuting the case, yet just such a case might arise and the due adminstration of the law would be effectually prevented; for, if the theory of the majority is correct, no other could be appointed and the state would be without a prosecutor, as, if the attorney in charge of the prosecution *must* be the county attorney, either elected or appointed, of the county where the trial is had, no other one could act. A distinction between the county attorney and other county officers exists in this: the county attorney is as much an officer of the district court of one county as another, while other county officers are limited in all things

to the territorial boundaries of their own county and there-
fore have no authority to act outside of that particular
jurisdiction. While it may not be a duty specially en-
joined by law upon a county attorney to follow civil and
criminal prosecutions into counties to which causes are
set for trial, yet I am far from believing that such action
on his part could vitiate a verdict and require a new trial
where the state or county had been successful. Having
had charge of the case from the beginning, and having be-
come familiar with the questions of law and fact involved,
which are in many cases quite complicated, it would in
many instances be a virtual surrender of the case to change
attorneys and place the prosecution or defense into the
hands of an attorney who knew nothing of the facts and
was not specially prepared in the law of the case. It must
be remembered that if it is error to allow him to follow a
criminal case, it would be equally erroneous to allow him
to follow a civil cause. It is held in this case as in the
cases cited that the county attorney "may have the assist-
ance of counsel employed on private account." The at-
torneys employed in this case were of the Richardson
county bar, none of them, I think, being residents of
Pawnee county. The mere fact that they were *not* the
attorneys for the county, duly elected and qualified, is their
only passport to the court of Pawnee county and their ad-
mission to the control and management of the prosecution
of plaintiff in error. This I do not think is the rule. If
the law is as claimed, it should be amended at the earliest
practicable date.

In *State v. Carothers*, 1 G. Greene [Ia.], 464, it was
held, under a statute somewhat similar to our own, that it
was not only the right of the county attorney to follow a
cause into acounty to which the venue was changed, but
that it was his duty to do so.

2. Section 579 of the Criminal Code requires the prosecut-
ing attorney to subscribe his name to the information and
" indorse thereon the names of the witnesses known to him

at the time of filing the same; and at such time *before the trial* of any case, as the court may by rule or otherwise prescribe, he shall indorse thereon the names of such other witnesses as shall then be known to him."

By this provision it seems to me the matter of the indorsement of the names of additional witnesses is left to the sound discretion of the trial court, subject only to the requirement that such indorsement shall be made before the trial. I find no provision requiring it to be "in time to give the accused notice in season to anticipate their presence before trial," and I know of no authority to inject these words into the statute.

3. Section 413 of the Criminal Code provides that "Whenever on trial of any indictment for any offense there shall appear to be any variance between the statement in such indictment and the evidence offered in proof thereof in the Christian name or surname, or both Christian and surname, or other description whatever *of any person whomsoever therein named or described*, or in the name or description of any matter or thing whatsoever therein named or described, such variance shall not be deemed ground for an acquittal of the defendant unless the court before which the trial shall be had shall find that such variance is material to the merits of the case, or may be prejudicial to the defendant."

There never has been any question as to the identity of J. M. Thayer, neither has there been nor could there be any question as to his being the person referred to in the indictment as John M. Thayer. He testified in substance that he signs his name and is known as J. M. Thayer. The whole case shows that the variance in the name of the witness by using the word "John" instead of "Jerry" could not have been in any degree prejudicial to plaintiff in error, and if the section which we have quoted means anything, it is that the administration of the criminal laws of this state shall not be prevented when no actual prejudice results to the accused.