## State of Nebraska, appellee, v.
## Charles E. Kays, appellant.
___ N.W.2d ___

Filed October 15, 2013.    No. A-11-504.

1. **Appeal and Error.** In order to be considered by an appellate court, alleged errors must be both specifically assigned and specifically argued in the brief of the party asserting the error.

2. ____. An appellate court does not consider errors which are argued but not assigned.

3. **Rules of the Supreme Court: Conflict of Interest: Words and Phrases: Appeal and Error.** A "conflict of interest" has been interpreted by the Nebraska Supreme Court to fall within the definition of a "disability" under Neb. Ct. R. App. P. § 2-105(5) (rev. 2010).

4. **Rules of the Supreme Court: Recusal: Conflict of Interest: Words and Phrases: Appeal and Error.** For the purposes of Neb. Ct. R. App. P. § 2-105(5) (rev. 2010), the term "disability" includes situations where a judge has recused himself or herself due to a conflict of interest.

5. **Trial: Records: Appeal and Error.** The record of the trial court, when properly certified to an appellate court, imports absolute verity; if the record is incorrect, any correction must be made in the district court.

6. **Trial: Records: Evidence: Appeal and Error.** The trial court record cannot be contradicted in an appellate court by extrinsic evidence.

7. **Trial: Records: Appeal and Error.** An issue of fact cannot be made by an appellate court as to any matter properly shown by the records of the trial court.

8. **Trial: Records: Evidence: Appeal and Error.** In an appellate review, a transcript of the orders or judgment entered is the sole, conclusive, and unimpeachable evidence of the proceedings in the district court.

9. **Trial: Records: Appeal and Error.** The correctness of the trial court record may not be assailed collaterally in an appellate court.

10. **Motions for Mistrial: Prosecuting Attorneys: Waiver: Appeal and Error.** A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.

11. **Criminal Law: Convictions: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

12. **Sexual Assault: Words and Phrases.** For sexual penetration, it is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient.

13. **Effectiveness of Counsel: Records: Appeal and Error.** A claim of ineffective assistance of counsel need not be dismissed merely because it is made on direct appeal. The determining factor is whether the record is sufficient to adequately review the question.

14. **Effectiveness of Counsel: Evidence: Appeal and Error.** An appellate court will not address an ineffective assistance of counsel claim on direct appeal if it requires an evidentiary hearing.

15. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.

16. **Constitutional Law: Sentences.** In cases where a defendant does not raise a facial challenge to the constitutionality of the statute regarding his or her sentencing, but, rather, asserts that the sentence "as applied" to him or her constitutes cruel and unusual punishment, the challenge involves the same considerations as a claim of excessive sentence.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Frank E. Robak, Sr., of Robak Law Office, for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Inbody, Chief Judge, and Irwin and Moore, Judges.

Inbody, Chief Judge.

## I. INTRODUCTION

Charles E. Kays appeals his convictions, following a jury trial, of first degree sexual assault of a child and two counts of third degree sexual assault of a child, and appeals the sentences imposed thereon.

## II. FACTUAL BACKGROUND

The victim in this case, C.F., has lived with her grandparents, Kays and Linda Kays, since she was 4 years old. On October 5, 2010, C.F. got into an argument with Kays and Kays threatened to shoot several people, including C.F., C.F.'s father, Linda, and C.F.'s aunt. C.F. called her father, after which both C.F. and her father called the 911 emergency dispatch service. Two Omaha police officers, Joe Eischeid and another officer, responded to the Kays' home to conduct a check on the well-being of

C.F. and her younger brother. Upon investigation, the officers determined that there was no immediate threat; however, as the officers were leaving, C.F. became very upset and began crying. As a result, the officer accompanying Eischeid took C.F. outside to speak to her privately, at which time she disclosed sexual abuse.

In the meantime, Eischeid remained in the house with Kays. Kays informed Eischeid that "he thinks he knows what is bothering [C.F.]," and Kays indicated that "a few years ago [C.F.] had the habit of walking around the residence naked"; that "at times, she would come out of the shower or bathtub naked and run around the house"; and that "on several occasions, she would come up to him while . . . she did not have any clothes on and would sit on his face." Kays indicated he would tell C.F. that it was wrong and that she was a "big girl." Kays also told Eischeid that on a few occasions, C.F. would climb into bed with him, get under the covers while he was sleeping, and put her hand down his pants, touching his penis. Kays said he would tell her that it was not right and that she was a "big girl." Kays further indicated that he has a vibrating massager he uses on his back and that on one other occasion, he had used the vibrator on C.F. while she did not have any clothes on and may have accidentally touched her vaginal area with it. During Kays' statements, Eischeid did not ask any questions, testifying that he "was just totally shocked and just let him talk." After conferring with the other officer, Eischeid transported C.F. and her brother to "Project Harmony," an agency which has specially trained investigators to handle potential child sexual assault victims. Officer Amber Schlote from the child victims unit conducted an interview of C.F., and following the interview with C.F. and an interview with Kays, Kays was arrested and charged with first degree sexual assault of a child. The information was later amended to add two counts of third degree sexual assault of a child.

A jury trial was held on April 6 through 8, 2011. During voir dire, 13 jurors were sworn in, with the alternate juror not identified. Trial commenced. Evidence adduced at trial established that Kays was born in April 1941 and that C.F. was born in March 2000.

The State's first witness was Schlote. Schlote testified that during her interview of C.F., she asked C.F. to use dolls to demonstrate what had happened to her during the first incident of sexual abuse. According to Schlote,

> [C.F.] laid the grandpa doll on the floor on its back and used the doll that was her and sat it on top of the grandpa doll and showed that she was facing him with her knees under here. She was on her knees and her feet behind her and she said she straddled him.

Specifically, "[s]he showed that she straddled his chest and showed that he used his hand to pull her forward to his face." Additionally, C.F. demonstrated that the male doll put his head in the female doll's vaginal area. According to Schlote, C.F. demonstrated two different incidents where the female doll was pulled up toward the male doll's face, with the vaginal area in the male doll's face. In speaking with C.F., Schlote was able to determine that the incidents occurred in two locations or houses and that the incidents occurred over a period of time. After Schlote asked C.F. to draw a picture of something that happened, C.F. drew a picture of a vibrating massager. During the interview, C.F. indicated to Schlote that Kays acted inappropriately on four or five occasions.

C.F. testified that at the time of trial, she was 11 years old. She testified that she began living with her grandparents, Kays and Linda, when she was 4 years old and that her brother began living with them the following year. The first place that C.F. lived with her grandparents was on Cypress Drive in Omaha; then, when C.F. was 7 years old, they moved to a house on Holmes Street in Omaha. C.F. testified that she remembered that the move occurred when she was 7 years old, because Kays had a heart attack and wanted to move to a different residence. C.F. testified that since she began living with her grandparents, Kays had touched her four times in a way that made her feel bad.

C.F. testified that the first incident occurred when she was 4 years old and lived on Cypress Drive. C.F. testified that she had been sitting on her bed, when Kays told her to move on top of him and pull her pants down. Kays was lying down, and C.F. sat so that her legs were on both sides of him and

she was facing him. C.F. testified that Kays "would lick [her]" "[a]round [her] private" and that Kays told her not to tell anyone what happened or he would go to jail.

The second incident also occurred at the house on Cypress Drive. C.F. testified that she was 5 years old at the time of the second incident. C.F. testified that she was lying down with Kays in his bedroom when he told her to shut the door and to take off her panties. C.F. "went up next to [Kays]," he moved her to get her on top of him, and then he licked her vagina.

The third incident occurred when C.F. was 7 years old, after moving to the home on Holmes Street. C.F. testified that Kays touched her with his hands "[a]round [her] vagina."

The fourth incident also occurred at the Holmes Street address when she was 8 years old. Kays again touched C.F. "around [her] private" with his hands and with a vibrating massager. C.F. stated that Kays then told her to follow him into the bathroom and that he then plugged in the vibrating massager and put it on his penis until semen "went into the toilet."

C.F. responded in the negative when asked: "Did [Kays] put his fingers in your vagina?" and "[D]id he ever touch inside it?" and "Was there ever a time when he was touching you with his fingers that he put them in your private?" C.F. further responded negatively when asked whether she remembered a time where she said that "he took his finger and put it in [her] vagina."

The defense moved for a directed verdict on count I, first degree sexual assault of a child, on the basis that the State had not proved the element of penetration. The motion was overruled, and Kays called witnesses on his behalf consisting of Linda and himself. At the close of the evidence, the defense renewed its motion for a directed verdict, which was overruled by the court. After closing arguments, the case was submitted to the jury. The dismissal of the alternate juror is not found in the record.

The jury found Kays guilty of the charged offenses. The 12 jurors were polled, and, when asked, each juror responded individually that this was his or her verdict. Thereafter, the district court sentenced Kays to 15 to 15 years' imprisonment

on count I and 20 months' to 5 years' imprisonment each on counts II and III. Additionally, counts II and III were ordered to be served concurrently to each other and consecutively to count I. Kays was given credit for 97 days served.

## III. PROCEDURAL BACKGROUND

Kays timely appealed to this court, but filed an "Application for Relief, Guidance, or Other Remedy Including Striking of [the] Bill of Exceptions" and/or motion for the issuance of a show cause order as to why summary reversal should not be granted due to "Bill of Exceptions Irregularities Highly Prejudicial" to Kays. The accompanying affidavit set forth that copies of the bill of exceptions, one of which was e-mailed to Kays' appellate counsel by the court reporter, provided that 13 jurors had been selected and 13 jurors polled. However, the affidavit stated that in January 2012, after preparation of Kays' brief, the court reporter took the bill of exceptions, without signing it out, and substituted a replacement bill of exceptions which contained a file-stamped cover page dated August 11, 2011, and that this replacement bill of exceptions altered the polling of jurors to include 12 jurors. Kays' motion was over-ruled without prejudice to proceeding in the district court to correct the bill of exceptions. Kays then filed an application for remand of the cause to the district court to correct the bill of exceptions due to discrepancies in the original bill of exceptions and a subsequently filed bill of exceptions regarding the polling of a 13th juror, which motion for remand was sustained by this court. Thereafter, on September 4, 2012, a hearing was held before a different district court judge regarding Kays' motion to correct and file an amended bill of exceptions and a supplemental request for leave to amend the bill of exceptions to conform to the evidence; on the court's own motion, due to a conflict of interest, the original district court judge who had conducted the trial recused herself from the proceedings to amend the bill of exceptions.

At the hearing on Kays' motion to correct and file an amended bill of exceptions and a supplemental request for leave to amend the bill of exceptions to conform to the evidence, the court reporter testified that she was the court

reporter during Kays' jury trial and that she created the original bill of exceptions. The court reporter initially filed the original bill of exceptions on August 11, 2011. After the filing of the original bill of exceptions, the court reporter received a letter from Kays' appellate counsel, dated September 23, 2011, informing her that there were some errors in the bill of exceptions and that "he wanted [her] to correct it and refile it." The court reporter proceeded to have the bill of exceptions proofread again, made corrections, printed out a new corrected copy of the bill of exceptions, and refiled the corrected replacement bill of exceptions. She further testified that when Kays' appellate counsel "didn't tell [her] to do it a different way, that that was the way I was to do it. That's the first time I've ever had to do that before." The court reporter testified that at her request, the replacement bill of exceptions was backdated to August 11, 2011, which was the date that the original bill of exceptions had been filed. The court reporter testified that when she refiled the bill of exceptions, she was not aware she was not allowed to "backdate" it, and that she was not trying to hide anything or cover up anything by her actions. The court reporter admitted that she changed the contents of the bill of exceptions without court order or court approval, that she shredded the original bill of exceptions, and that she did not have court approval to destroy the original bill of exceptions. The court reporter further admitted that on a later unknown date, she backdated the replacement certificate page to reflect the original filing date of August 11, 2011.

The court reporter also testified that she e-mailed Kays' appellate counsel a copy of the original version of the bill of exceptions and that when she attempted to e-mail a corrected version of the bill of exceptions, she e-mailed the wrong file and did not send the proofread version. When asked about e-mailing the bill of exceptions to defense counsel, the court reporter stated:

> [W]hy I emailed that to him is because I — I felt bad. This is the first time that's ever happened to me where someone pointed out there [were] errors in my Bill of Exceptions. Usually you have to pay for the copies. I felt

bad, so I emailed it to him, and I must have picked the wrong file.

The court reporter admitted the mistakes that she made in this case, but testified that the final version of the bill of exceptions currently filed with the clerk of the district court is the accurate version of what transpired at Kays' trial. She further testified:

I feel bad that it all happened. It was a mistake. And I — I tried to correct it because I wanted to show what happened in the courtroom. I did not do it the right way. I've learned that now. I mean, I just want the accurate record to go up to the appeals court. That's what happened. There were 12 jurors.

One of the exhibits admitted into evidence was an affidavit from juror No. 13. Her affidavit set forth that she had been impaneled as a member of the jury in Kays' case and that she sat as a juror until the case was submitted for deliberation at the close of the evidence, at which time the judge explained that she was the alternate juror and that her service was no longer needed. Her affidavit stated that she did not deliberate in Kays' case.

The district court entered an order finding that the bill of exceptions prepared and filed by the court reporter had been corrected as ordered and constituted the bill of exceptions upon which Kays' appeal should proceed.

## IV. ASSIGNMENTS OF ERROR

On appeal, Kays' assignments of error, consolidated and restated, are that the district court erred in finding that the replacement bill of exceptions was credible and was to serve as the bill of exceptions in this case and in failing to discharge the alternate juror prior to submission of the case to the jury for deliberation, in accordance with Neb. Rev. Stat. §§ 29-2004(2) and 29-2005 (Reissue 2008), resulting in a verdict by a 13-member jury without his consent or waiver. Kays also contends that he did not receive a fair and impartial trial because of prosecutorial misconduct, that the evidence was insufficient to support his convictions, and that he received

ineffective assistance of trial counsel. Finally, Kays contends that the sentences imposed upon him were excessive.

[1,2] We note that in his brief, Kays argues several errors that are not assigned, such as that the district court abused its discretion in not allowing testimony concerning a psychologist, that a written question by the jury contained in the file was not addressed on the record, and that the district court erred in overruling his motion for directed verdict. In order to be considered by an appellate court, alleged errors must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Dowd Grain Co. v. County of Sarpy*, 19 Neb. App. 550, 810 N.W.2d 182 (2012). We do not consider errors which are argued but not assigned. See *State v. Duncan*, 278 Neb. 1006, 775 N.W.2d 922 (2009).

## V. ANALYSIS

### 1. Bill of Exceptions

Kays contends that the district court erred in finding that the replacement bill of exceptions was credible and was to serve as the bill of exceptions in this case.

Due to discrepancies in the original bill of exceptions and a subsequently filed bill of exceptions, the cause was remanded to the district court for the certification of an appellate record to be conducted pursuant to the procedure set forth in Neb. Ct. R. App. P. § 2-105(5) (rev. 2010), which provides:

> The parties in the case may amend the bill of exceptions by written agreement to be attached to the bill of exceptions at any time prior to the time the case is submitted to the Supreme Court. Proposed amendments not agreed to by all the parties to the case shall be heard and decided by the district court after such notice as the court shall direct. The order of the district court thereon shall be attached to the bill of exceptions prior to the time the case is submitted to the Supreme Court. Hearings with respect to proposed amendments to a bill of exceptions may be held at chambers anywhere in the state. If the judge shall have ceased to hold office, or shall be prevented by disability from holding the hearing, or shall be absent from the state, such proposed amendments shall

be heard by the successor judge, or by another district judge in the district, or by a district judge in an adjoining judicial district.

[3] On September 4, 2012, a hearing was held before a different district court judge regarding Kays' motion to correct and file an amended bill of exceptions and a supplemental request for leave to amend the bill of exceptions to conform to the evidence; on the court's own motion due to a conflict of interest, the original district court judge who had conducted the trial recused herself from the proceedings to amend the bill of exceptions. Although a "conflict of interest" is not one of the listed factors in § 2-105(5) which prevent the original judge from presiding over a hearing to certify a bill of exceptions, the rule does provide that another district judge may hold the hearing if the original judge "shall be prevented by disability from holding the hearing." In similar circumstances, a "conflict of interest" has been interpreted by the Nebraska Supreme Court to fall within the definition of a "disability." See, *In re Complaint Against White*, 264 Neb. 740, 651 N.W.2d 551 (2002); *Stewart v. McCauley*, 178 Neb. 412, 133 N.W.2d 921 (1965); *Gandy v. State*, 27 Neb. 707, 43 N.W. 747 (1889).

*Stewart v. McCauley, supra*, involved an action instituted in a district court by an infant child's prospective adoptive parents to bring to the court's attention the need to provide for the welfare, custody, and control of a neglected and dependent child, where the county attorney had accepted employment in a civil action representing the child's biological parents, which made it impossible to secure the consent of the county attorney as required by statute at that time and therefore prevented any action to protect the welfare of the minor child. The Nebraska Supreme Court phrased the question presented as whether an irresponsible parent (or possibly a much worse parent) could prevent action by the juvenile court to protect the welfare of an innocent child merely by hiring the county attorney in a civil action involving that child.

The Supreme Court turned to Neb. Rev. Stat. § 23-1205 (1943), which, at that time, gave the district court the authority to appoint an acting county attorney in the event of absence,

sickness, or disability of the county attorney. *Stewart v. McCauley, supra*. The Supreme Court noted that as early as its decision in *Gandy v. State, supra*, in 1889, the term "disability" had been interpreted "to cover situations where the county attorney by reason of prior employment disqualified himself to act in the new case." *Stewart v. McCauley*, 178 Neb. at 418, 133 N.W.2d at 925. See, also, *In re Complaint Against White, supra* (judge's personal dissatisfaction with performance of county attorney's office did not constitute "disability" within meaning of § 23-1205 (Reissue 1997)). Thus, the Supreme Court in *Stewart v. McCauley, supra*, determined that the county attorney's representation of the minor child's biological parents constituted a "disability" for the purposes of § 23-1205 (1943).

[4] Applying a consistent interpretation of the term "disability" to § 2-105(5), if the term "disability" is interpreted to cover situations where a public official disqualifies himself or herself to act in a new case by reason of prior employment, it follows that "disability" would likewise cover situations where a judge has recused himself or herself due to a conflict of interest. Thus, the original district court judge who presided over Kays' trial and who recused herself from holding the hearing regarding the certification of the bill of exceptions due to a conflict of interest was, in fact, prevented by a "disability" from holding the hearing, and the hearing was properly held by a different district court judge, who then certified a bill of exceptions to this court.

[5-7] The record of the trial court, when properly certified to an appellate court, imports absolute verity; if the record is incorrect, any correction must be made in the district court. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *Wonderling v. Conley*, 182 Neb. 446, 155 N.W.2d 349 (1967). The trial court record cannot be contradicted in an appellate court by extrinsic evidence. See *Anderson v. State*, 163 Neb. 826, 81 N.W.2d 219 (1957). An issue of fact cannot be made by an appellate court as to any matter properly shown by the records of the trial court. See *id*.

[8,9] Upon remand, the district court entered an order finding that the bill of exceptions prepared and filed by the court

reporter has been corrected as ordered and constitutes the bill of exceptions upon which Kays' appeal should proceed. In an appellate review, a transcript of the orders or judgment entered is the sole, conclusive, and unimpeachable evidence of the proceedings in the district court. *Anzalone Inv. Co. v. City of Omaha*, 179 Neb. 314, 137 N.W.2d 857 (1965). The correctness of the trial court record may not be assailed collaterally in this court. *Id*. Thus, Kays' appeal will be heard on the bill of exceptions presented to this court to which we import absolute verity.

## 2. Discharge of Alternate Juror

Kays next contends that the district court erred in failing to discharge the alternate juror prior to submission of the case to the jury for deliberation, resulting in a verdict by a 13-member jury without his consent or waiver.

However, as we noted in the prior section of this opinion, having determined that the bill of exceptions which has been certified to this court is given absolute verity, we note that the bill of exceptions reflects that 13 jurors were selected at the beginning of the trial. Although the record does not reflect that the alternate juror was discharged, the record does reflect that when the jury was polled after the verdict, 12 jurors responded affirmatively that the verdict was their verdict. Additionally, at the September 4, 2012, hearing on remand, an affidavit was received into evidence from juror No. 13 which set forth that she had been impaneled as a member of the jury in Kays' case and that she sat as a juror until the case was submitted for deliberation at the close of the evidence, at which time the judge explained that she was the alternate juror and that her service was no longer needed. Her affidavit stated that she did not deliberate in Kays' case. The district court entered an order finding that juror No. 13 did not participate in deliberations and that the bill of exceptions as corrected constituted the bill of exceptions on which the appeal should proceed. The record does not support, and in fact contradicts, Kays' claim that his verdict was delivered by a 13-member jury. This assignment of error is without merit.

### 3. Fair and Impartial Trial

Kays also contends that he did not receive a fair and impartial trial because of prosecutorial misconduct, insufficient evidence to support his convictions, and ineffective assistance of trial counsel.

### (a) Prosecutorial Misconduct

Kays argues that the prosecution committed misconduct during its opening statement, during its cross-examination of both Kays and defense witness Linda, and during its closing arguments. Kays also claims that the State asked leading questions of the victim.

[10] A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998); *State v. Balvin*, 18 Neb. App. 690, 791 N.W.2d 352 (2010).

The record discloses that Kays did not move for a mistrial at any time during the trial. Consequently, he has waived his claim that a mistrial should have been declared due to the prosecution's alleged misconduct.

### (b) Insufficiency of Evidence

Kays also contends that the evidence was insufficient to support his convictions of one count of first degree sexual assault of a child and two counts of third degree sexual assault of a child.

[11] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013); *State v. Howell*, 284 Neb. 559, 822 N.W.2d 391 (2012). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

### (i) First Degree Sexual
### Assault of Child

[12] A person commits first degree sexual assault of a child if he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. Neb. Rev. Stat § 28-319.01 (Reissue 2008). Neb. Rev. Stat. § 28-318(6) (Reissue 2008) defines sexual penetration as

> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.

It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007).

Kays' argument regarding the insufficiency of the evidence focuses on the evidence of penetration. There was no dispute at trial over the ages of Kays and C.F. It is clear that the age element of the offense is satisfied, because the evidence established that Kays was born in April 1941 and that C.F. was born in March 2000. Additionally, the evidence, when viewed in the light most favorable to the State, established that Kays licked C.F.'s vagina. This evidence is sufficient to support Kays' conviction of first degree sexual assault of a child.

### (ii) Third Degree Sexual
### Assault of Child

Kays was charged with two counts of third degree sexual assault of a child. A person commits third degree sexual assault of a child if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older and does not cause serious personal injury to the victim. See Neb. Rev. Stat. § 28-320.01(1) and (3) (Reissue 2008).

There is no question that the age element of the offense is satisfied, because the evidence established that Kays was

born in April 1941 and that C.F. was born in March 2000. The evidence, when viewed in the light most favorable to the State, establishes that Kays touched C.F.'s vagina with his hands and, on another occasion, touched C.F.'s vagina with his hands and with a vibrating massager. Thus, the evidence is sufficient to support both of Kays' convictions for third degree sexual assault of a child.

### (c) Ineffective Assistance of Counsel

Kays claims that his trial counsel was ineffective in failing to object when the prosecutor made "improper, misleading, or derogatory statements"; in failing to move for a mistrial or new trial; in failing to discuss the presentence investigation report with Kays prior to the time of sentencing; and in failing to notice 13 jurors in the selection, deliberation, and polling of the jury. Brief for appellant at 27.

[13,14] A claim of ineffective assistance of counsel need not be dismissed merely because it is made on direct appeal. The determining factor is whether the record is sufficient to adequately review the question. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013). Conversely, we will not address an ineffective assistance of counsel claim on direct appeal if it requires an evidentiary hearing. *Id*.

[15] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), Kays must show that his counsel's performance was deficient and that this deficient performance actually prejudiced his defense. See *State v. McClain, supra*.

### (i) Failure to Object to Prosecutorial Misconduct

First, we address Kays' claim that his trial counsel was ineffective for failing to raise proper objections when the prosecutor made "improper, misleading, or derogatory statements." It appears from Kays' brief that his allegations relate to five separate areas: opening statements, leading questions of the victim,

cross-examination of Linda, cross-examination of Kays, and closing arguments.

### a. Opening Statements

Kays argues that trial counsel was ineffective for failing to object when the prosecutor referenced "sexual assaults" in the plural and that because he was charged with only one count of "sexual assault," this statement was highly prejudicial. Although Kays correctly notes that he was charged with only one count of first degree sexual assault of a child, he was also charged with an additional two counts of third degree sexual assault of a child. Since the prosecutor's comments were accurate—Kays was charged with multiple counts of sexual assault—there can be no prosecutorial misconduct, no prejudice, and no ineffectiveness of trial counsel for failing to object.

### b. Leading Questions of Victim

Kays contends that his trial counsel was ineffective for failing to object to the prosecution's asking leading questions of C.F. Kays objects to the following specific instances of questioning of C.F. by the prosecution:

Q. Were you facing him?

A. Yeah.

Q. So you were looking at each other?

A. Uh-huh.

Q. Was he laying down or sitting up?

A. He was laying down.

Q. And how did he touch you?

A. He would lick me.

Q. And how did he lick you? Did he move you to his face?

[Defense counsel]: Objection, leading.

THE COURT: Sustained.

. . . .

Q. And after he got done licking you, your vagina — or how long did that last?

A. I don't remember.

Kays also objects to the prosecutor's questioning of C.F. in this exchange concerning Kays' hands and fingers:

Q. And where was he touching your vagina?

A. Around it.

Q. And then did he ever touch inside it?

A. No.

Q. On this time did he put his fingers in your vagina?

[Defense counsel]: Objection, asked and answered.

THE COURT: Overruled.

. . . .

Q. Did he put his fingers in your vagina?

A. No.

. . . .

Q. Was there ever a time when he was touching you with his fingers that he put them in your private?

[Defense counsel]: Objection, asked and answered.

[C.F.]: No.

THE COURT: Overruled.

. . . .

Q. Do you remember a time when you told us that he took his finger and put it in your vagina?

[Defense counsel]: Objection, leading.

THE COURT: Overruled.

[C.F.]: No.

In each of these instances, defense counsel objected to the prosecutor's questions, and therefore, Kays cannot establish deficient performance, because defense counsel has performed in the manner requested. Additionally, defense counsel did not object to the State's question "And after he got done licking you, your vagina — or how long did that last?"; however, C.F.'s answer of "I don't remember" did not prejudice Kays and neither did her earlier testimony regarding this particular incident, that Kays had touched her "[a]round [her] private," or vagina. Thus, Kays cannot establish any prejudice from defense counsel's failure to object to this particular question posed to C.F. by the State.

### c. Cross-Examination of Linda

Kays contends that the prosecutor engaged in highly inflammatory and prejudicial nonrelevant cross-examination of Linda consisting of the following exchange:

Q. [Linda, C.F.] is not your biological granddaughter; is that correct?

A. Yes.

Q. Your husband had a child with another woman while you were with him?

A. That's correct.

Q. And that would be [C.F.'s] father?

A. Yes.

Q. And he's had other children since you've been with him with other women?

[Defense counsel]: Objection, relevance.

THE COURT: Overruled — sustained.

Again, defense counsel objected to the prosecution's questions and Kays cannot establish deficient performance, because defense counsel has performed in the manner requested.

### d. Cross-Examination of Kays

Kays contends that the prosecutor engaged in what he referred to as a "malicious attack" during cross-examination of Kays, brief for appellant at 25, during the following exchange:

Q. And . . . you sat here while your wife was testifying; correct?

A. Yes.

Q. And so it's true [C.F.] is not your wife's biological grandchild?

A. Correct.

Q. Who was the person you had a child with out of wedlock?

A. [My son's] mom.

Q. Where were you living when that occurred?

[Defense counsel]: Objection, relevance.

THE COURT: Sustained.

. . . .

Q. But you were married to your wife at the time that you had —

A. We were separated —

[Defense counsel]: Objection, relevance.

THE COURT: Only one person can talk at a time. Overruled. He's answered the question. They were separated.

. . . .

Q. And were you separated every time you had a child out of wedlock?

[Defense counsel]: Objection.

THE COURT: Sustained.

Defense counsel objected to the prosecution's questions, and Kays cannot establish deficient performance, because defense counsel has performed in the manner requested.

### e. Closing Arguments

Kays contends that certain statements made by the prosecutor during closing arguments were improper and should have been objected to by defense counsel. Kays objects to the following statements made by the prosecutor during closing arguments:

Do you believe [C.F.] and all of the corroborating evidence or what this guy said? The defense attorney got up here and said, don't forget about Paul Harvey. You'll hear the rest of the story. I didn't hear the rest of the story. All you heard was a liar. It wasn't the rest of the story. Why is he not credible? Why is he lying?

. . . .

. . . [H]e's telling you what he wants when he wants. That's not the story. He's lying.

. . . .

. . . Look at his lies, and use your common sense. Throw out his testimony.

The record on direct appeal is insufficient to review this claim.

### (ii) Failure to Move for
### Mistrial/New Trial

Kays claims that his counsel was ineffective in failing to move for a mistrial due to the prosecution's inflammatory statements and conduct. The record on direct appeal is insufficient to review Kays' claim that his trial counsel was ineffective for failing to move for a mistrial.

Kays also contends that his counsel was ineffective for failing to move for a new trial due to the prosecution's inflammatory statements and conduct. However, Kays does not allege what issues should have been raised in a motion for new trial or what grounds he would have had for raising those issues. More important, there are no allegations explaining why the motion would have been successful or how he was prejudiced by trial counsel's failure to file the motion. See, *State v. Davis*, 6 Neb. App. 790, 577 N.W.2d 763 (1998) (defendant's failure to set forth allegations explaining why motion for new trial would have been successful or how he was prejudiced by attorney's failure to file motion did not justify presumption of prejudice for purposes of postconviction claim of ineffective assistance of counsel); *State v. McGurk*, 3 Neb. App. 778, 532 N.W.2d 354 (1995) (in order to satisfy prejudice prong of ineffective assistance of counsel analysis, defendant must first make allegation of nature and effect of requisite prejudice). Thus, Kays has not alleged sufficient prejudice and his claim of ineffectiveness of counsel for failing to file a motion for new trial is without merit.

### (iii) Presentence Investigation Report

Kays claims that his trial counsel was ineffective in failing to discuss the presentence investigation report with him prior to the time of sentencing.

The record reveals that Kays' trial counsel was unable to review the presentence investigation report until the afternoon of the sentencing hearing due to delays in the report's being made available by the probation office. However, counsel did review the report and, at the sentencing hearing, referenced information contained in the report. Trial counsel indicated that he spoke to Kays about the contents of the presentence

investigation report, but Kays did not make any comments at the sentencing hearing to indicate whether counsel reviewed the report with him.

Neb. Rev. Stat. § 29-2261(6) (Reissue 2008) provides, in part, that a court "may permit inspection of the [presentence investigation] report or examination of parts thereof by the offender or his or her attorney, or other person having a proper interest therein, whenever the court finds it is in the best interest of a particular offender." Thus, the plain language of the statute does not require an attorney to physically review the presentence investigation report with a defendant.

Furthermore, even if his trial counsel did fail to review his presentence investigation report with him, Kays has not alleged how he was prejudiced by counsel's actions. Specifically, he has not alleged how the ultimate outcome of the sentencing hearing would have been different had he had the opportunity to review the report with his trial counsel. See *State v. Derr*, 19 Neb. App. 326, 809 N.W.2d 520 (2011) (defendant could not show prejudice from trial counsel's alleged failure to adequately review contents of presentence report with defendant prior to sentencing hearing, and therefore such failure did not constitute ineffective assistance of counsel; defendant did not allege how ultimate outcome of sentencing hearing would have been different had he had opportunity to review report with counsel). Thus, this assertion has no merit.

### (iv) 13 Jurors

Kays contends that his trial counsel was ineffective in failing to notice 13 jurors in the selection, deliberation, and polling of the jury. Having determined earlier in this opinion that the record does not support Kays' claim that his verdict was delivered by a 13-member jury, there is no ineffectiveness of counsel in this regard. This assignment of error is without merit.

### (v) Summary

Having considered Kays' numerous allegations regarding the ineffectiveness of trial counsel, we find the majority of them to be without merit. However, we find that the record on

direct appeal is insufficient to address Kays' claims that trial counsel was ineffective for failing to object to comments made by the prosecution during closing statements and for failing to move for a mistrial due to inflammatory statements and conduct by the prosecution.

### 4. Excessive Sentences

[16] Kays contends that due to his advanced age, lack of criminal history, and ailing health, the cumulative sentences imposed effectively constitute a sentence of life imprisonment and, as applied to him, constitute cruel and unusual punishment. In cases where a defendant does not raise a facial challenge to the constitutionality of the statute regarding his or her sentencing, but, rather, asserts that the sentence "as applied" to him or her constitutes cruel and unusual punishment, the challenge involves the same considerations as a claim of excessive sentence. See *State v. Robinson*, 278 Neb. 212, 769 N.W.2d 366 (2009).

Kays was convicted of one count of first degree sexual assault of a child and two counts of third degree sexual assault of a child. First degree sexual assault of a child is a Class IB felony with a mandatory minimum sentence of 15 years' imprisonment and a maximum sentence of life imprisonment. See, Neb. Rev. Stat. § 28-105 (Reissue 2008); § 28-319.01. Kays' sentence of 15 to 15 years' imprisonment is the most lenient sentence of imprisonment that could be imposed by the district court for this conviction.

Third degree sexual assault of a child is a Class IIIA felony punishable by up to 5 years' imprisonment and/or a $10,000 fine. See, § 28-105; § 28-320.01(1) and (3). Kays' sentences of 20 months' to 5 years' imprisonment on each of his convictions for third degree sexual assault of a child were within the statutory sentencing range.

At the time of the preparation of the presentence investigation report, Kays was 70 years old, married, and retired. He has a minimal criminal history consisting of a conviction for assault and a conviction for driving under the influence, both having occurred in the early 1970's. Kays has medical issues, including having had two heart attacks and a brain injury.

According to a report by Kays' physician, Kays suffered an episode of anoxic brain injury in November 2006 and underwent a prolonged intensive care unit stay requiring mechanical ventilation. The doctor reported that since that time, Kays has demonstrated decreased short-term memory, decreased impulse control, and irritability. His doctor reports that Kays' diagnosis would potentially limit his ability to think rationally, recall episodes, and control his impulses.

According to the presentence investigation report, Kays' scores on the "Simple Screening Instrument" were in the low risk range and there is no indication of a problem with substance abuse or of substance use contributing to this offense. Kays scored in the low risk range for recidivism, based upon a combined risk assessment of the "Static 99-R" risk assessment and the "Stable 2007" risk assessment. On the "Vermont Assessment of Sex Offender Risk," Kays scored in the high risk range, with some of the reasons for the high score including the age of the victim when the abuse began, a prior conviction for assault, and the level of intrusiveness for the current offense. Kays' total score on the level of service/case management inventory indicated that he was in the medium-high risk range to recidivate.

Considering that the sentences imposed are within the applicable statutory sentencing ranges, that the Class IB felony sentence is the most lenient sentence available, and that Kays further benefited from the district court's decision to order the third degree sexual assault counts to be served concurrently—and taking into account the seriousness of the offenses for which Kays was convicted, Kays' age and health, his minimal criminal history, and his scores on the risk assessments—we cannot say the district court abused its discretion in the sentences imposed.

## VI. CONCLUSION

Having considered and found Kays' assignments of error, including most of his claims of ineffective assistance of trial counsel, to be without merit, his convictions and sentences are affirmed. However, we specifically find that the record on

direct appeal is insufficient to address Kays' claims that his trial counsel was ineffective for failing to object to comments made by the prosecution during closing statements and for failing to move for a mistrial due to inflammatory statements and conduct by the prosecution.

AFFIRMED.

IRWIN, Judge, dissenting.

I respectfully disagree with the majority's conclusion that the term "disability" as used in Neb. Ct. R. App. P. § 2-105(5) (rev. 2010) encompasses "situations where a judge has recused himself or herself due to a conflict of interest." Such an interpretation, as evidenced by the facts of the present case, defeats the very purpose of § 2-105(5) and seriously undermines the sanctity of judicial proceedings and public confidence and trust in such proceedings.

Although the majority opinion references some actions of the court reporter that led to this appeal, the majority has understated the severity of the court reporter's misconduct. In this case, appellant's appellate counsel discovered errors in the originally created bill of exceptions, including indications that 13 jurors had deliberated and been polled. When he brought the errors to the attention of the court reporter, she obtained the bill of exceptions from the court file, removed the file-stamped cover page of the bill of exceptions, shredded the remaining pages of the original bill of exceptions, created an entirely new bill of exceptions, and backdated the newly created bill of exceptions with help from an employee in the district court clerk's office. These actions were all, without question, contrary to well-established rules concerning the proper conduct of a court official.

Appellant brought these matters to the attention of this court and requested we remand the matter to the district court for a properly conducted hearing to amend or correct the bill of exceptions. Appellant's request was clearly an attempt to ensure the accuracy and completeness of the record available to us for our review of the serious criminal matters involved in this case. We sustained appellant's motion and remanded the matter for the district court to amend or correct the bill of

exceptions in accordance with the requirements of § 2-105(5). However, prior to the hearing, the judge who had conducted the trial recused herself from the proceedings.

The Nebraska appellate courts have not previously had occasion to discuss § 2-105(5). The rule provides as follows:

> The parties in the case may *amend the bill of exceptions* by written agreement to be attached to the bill of exceptions at any time prior to the time the case is submitted to the Supreme Court. Proposed amendments not agreed to by all the parties to the case shall be heard and decided by the district court after such notice as the court shall direct. The order of the district court thereon shall be attached to the bill of exceptions prior to the time the case is submitted to the Supreme Court. Hearings with respect to proposed *amendments to a bill of exceptions* may be held at chambers anywhere in the state. *If the judge shall have ceased to hold office, or shall be prevented by disability from holding the hearing, or shall be absent from the state, such proposed amendments shall be heard by the successor judge, or by another district judge in the district, or by a district judge in an adjoining judicial district.*

(Emphasis supplied.)

The plain language of the rule makes it clear that the purpose of holding a hearing, presided over by the trial judge, is to ensure the creation of an accurate record in situations where the parties cannot reach an agreement about the proposed amendments or corrections. In such a situation, the trial judge who presided at trial will be crucial to the process, because that judge is in the best position to make a determination about the accuracy of a party's disputed attempt to amend or correct the bill of exceptions and will necessarily be in the best position to exercise judgment about any disputed amendments or corrections and how to most accurately complete the record of what occurred at trial. A substitute judge who had no prior history of the case and who was not present during any of the original proceedings is necessarily not in a position to make such determinations as effectively or as accurately. As a result, the

circumstances in which the rule allows for a substitute judge are necessarily narrow.

Section 2-105(5) delineates three specific situations in which a substitute judge may preside over the hearing. Notably, none of those situations are applicable to the present case. The rule provides that a substitute judge may preside over the hearing if the original trial judge has ceased to hold office, is absent from the state, or is prevented "by disability" from holding the hearing. A plain reading of these three exceptions, especially in light of the important role to be played by the judge presiding over a § 2-105(5) hearing, makes it apparent that these exceptions are intended to allow for a substitute judge only when the original trial judge is incapable of conducting the hearing.

There is no dispute that the use of a substitute judge in this case was not authorized by either of the first two exceptions in the rule; the original trial judge continued to hold office and was not absent from the state. The majority concluded that the judge was prevented "by disability" from holding the hearing. However, the record presented does not disclose any disability that would have prevented the original trial judge from holding the hearing.

In this case, the trial judge entered an order—on her own motion—recusing herself from conducting the hearing on the basis of a "conflict of interest." There was no motion by any party, and there was no hearing concerning any alleged conflict of interest. There is nothing anywhere in the record to suggest what possible conflict of interest prevented the original trial judge from conducting the hearing, as she was required to do under § 2-105(5). The majority simply accepts that there was, in fact, a conflict of interest (although without any indication of what it might have been) and then concludes that such a conflict of interest constitutes a disability under the rule. I cannot agree.

The majority cites to three authorities to support its conclusion that a conflict of interest should constitute a disability under this rule. However, none of the cases stand for the proposition that an entirely undisclosed alleged conflict of

interest constitutes a disability for purposes of a rule like § 2-105(5).

The majority cites to *In re Complaint Against White*, 264 Neb. 740, 651 N.W.2d 551 (2002). The majority does not explain how that opinion supports its conclusion, and a review of that opinion demonstrates that it does not. The factual context of the *In re Complaint Against White* opinion concerned a county court judge who had been dissatisfied that one of her opinions had been reversed by the district court and that the county attorney had not appealed the reversal. The county court judge injected herself into the proceedings, allegedly demanded an appeal and provided to a deputy county attorney legal arguments and authorities in support of an appeal, and appeared in front of the district court to request the appointment of a special prosecutor because the county attorney had declined to file an appeal. In that context, the Nebraska Supreme Court noted that there was no basis for the appointment of a special prosecutor under a court rule allowing for such appointment in the event of absence, sickness, or disability of the county attorney. The court concluded that the term "disability" had been interpreted, in the context of that rule, to include situations where the county attorney was actually disqualified to act because of a conflict of interest related to employment. The majority also cites, and discusses, *Stewart v. McCauley*, 178 Neb. 412, 133 N.W.2d 921 (1965). The factual context of *Stewart v. McCauley* involved an actual disqualification of a prosecutor because of civil representation of one of the parties.

Both the Supreme Court's noting in *In re Complaint Against White* and the court's holding in *Stewart v. McCauley* that the term "disability" in the context of rules concerning appointing a special prosecutor includes situations where the county attorney is actually disqualified from performing his or her duties because of a prior employment conflict of interest are clearly distinct from the situation in the present case. The use of the term "disability" in both of those situations clearly related to an attorney being unable to perform his or her duties *as an advocate* on behalf of a party because of an established and

actual conflict of interest. There is nothing in either case to suggest that a mere assertion of a conflict of interest, without one actually existing, would suffice to constitute a disability. The actual conflict of interest contemplated in that situation is one that actually does prevent the attorney from performing his or her role as an advocate.

The role of the judge in a § 2-105(5) hearing is markedly different, however. The judge is not to be an advocate for either party, but a neutral and knowledgeable arbiter ensuring the creation of an accurate appellate record concerning a case that the judge actually presided over. When the judge presided over the entire trial without any conflict of interest which prevented her from fairly judging the case, and without any demonstration or suggestion of what possible conflict of interest would prevent her from carrying out that same role to ensure the creation of an accurate record of the trial, finding a disability is entirely different and unwarranted.

The majority also cites to *Gandy v. State*, 27 Neb. 707, 43 N.W. 747 (1889). Although the majority does not discuss the application of that case, it also involves the notion that if a prosecutor has an actual conflict of interest which prevents him or her from performing official duties, that conflict can be considered a disability for purposes of meriting appointment of another prosecutor. In that case, the proposition was expressed in relation to a county attorney being disqualified from prosecuting a criminal defendant whom he had previously represented in other proceedings. Once again, that kind of actual conflict of interest which prevents the performance of duties is clearly a very different situation from one where a judge declines to preside over a hearing in which it is not apparent that there is any actual conflict of interest.

Rather than comparing the factual context of the present case to situations and prior cases wherein prosecutors had actual conflicts of interest meriting the appointment of special prosecutors, I would suggest that we should be guided by cases involving the propriety of appointing a substitute or successor judge to perform duties that would otherwise be required of a trial judge.

For example, in *Newman v. Rehr*, 10 Neb. App. 356, 630 N.W.2d 19 (2001), we were presented with a question about the authority of a successor judge to render judgment in a case over which he had not presided and was not familiar. In that case, the retirement of District Judge Lawrence J. Corrigan resulted in the use of interim judges prior to District Judge W. Mark Ashford's taking office. In one of the cases heard during that interim, retired District Judge James A. Buckley heard the case as an interim judge, but there was no record made of the hearing conducted by Judge Buckley. After Judge Ashford took office, he signed the final order in the matter. On appeal, we held that because Judge Buckley had heard the case and the witnesses, no other judge could have the degree of familiarity with the case that he had. Consequently, we concluded that the parties' stipulation to submit the case to another judge could not be fairly applied or implemented by any judge other than Judge Buckley. We held it was reversible error for Judge Ashford to enter an order based on evidence he had not heard, and we vacated the judgment.

That case, although in a different factual context, is consistent with the notion that substitution of judges should be limited and avoided when reasonably possible. The judge who is familiar with the proceeding and capable of performing his or her judicial function and in the best position of doing so should be the one to discharge judicial duties. See, also, *Malony v. Adsit*, 175 U.S. 281, 20 S. Ct. 115, 44 L. Ed. 163 (1899) (emphasizing that knowledge of what happened at trial is unique to judge who presided and cannot be brought to judge who did not participate in trial).

Similarly, in *Commonwealth v. Trapp*, 396 Mass. 202, 213, 485 N.E.2d 162, 169 (1985), the Massachusetts Supreme Court discussed appropriate substitution of judges and explained that it is a matter "of grave concern to the proper administration of justice." In that case, the judge who had presided over the trial had been "absent" during jury deliberations, a substitute judge had taken questions from the jury and answered them, and a second substitute judge had taken the jury's verdict. *Id*. The court noted that a Massachusetts rule of criminal

procedure allowed for the substitution of a judge presiding over a proceeding in situations where the judge is unable to proceed "by reason of death, sickness, or other disability." See Mass. R. Crim. P. 38(a) (2006). The court noted that the rule is mandatory and that given the language of the rule, except for ministerial acts such as the taking of a verdict, the original judge should ordinarily be available throughout the process to "ensure the integrity of the trial process." *Commonwealth v. Trapp*, 396 Mass. at 214, 485 N.E.2d at 170.

The Massachusetts court also discussed *Durden v. The People*, 192 Ill. 493, 61 N.E. 316 (1901), and *State v. Gossett*, 11 Wash. App. 864, 527 P.2d 91 (1974), both involving substitution of judges. In *Durden v. The People*, the Illinois Supreme Court held that the power of judges did not include the right to delegate a duty involving the exercise of judgment and application of legal knowledge and judicial deliberation to facts known to the first judge and not to the second judge. Along those same lines, in *State v. Gossett*, the Washington Court of Appeals found it to be error when a substitute judge, over the objection of the defendant, instructed the jury in response to jury questions.

The Massachusetts, Illinois, and Washington cases are all consistent in the notion that judicial integrity and confidence in the sanctity of the judicial proceedings dictate that a judge who presides over a judicial proceeding and gains important knowledge of the proceedings should not delegate to a substitute judge, who is unfamiliar with the case, judicial duties that depend on discretion and exercise of judgment concerning the proceedings known to the original judge and not to the substitute. Such substitution should be allowed only in narrow and unusual circumstances, and rules governing such substitution should be narrowly and strictly construed.

Section 2-105(5) is a rule which governs such substitution of judges and which, as a result, should be narrowly and strictly construed. The rule indicates that a substitute judge may be necessary at a hearing to properly amend or correct a bill of exceptions only where the original judge is incapable of carrying out his or her duties, either because that judge

is no longer serving on the bench, is physically absent from the jurisdiction, or is suffering some kind of "disability" that actually prevents the discharge of duties. Here, none of those narrow situations are apparent on the record presented to this court, where the judge inexplicably and on her own motion recused herself.

The majority overlooks the fact that there is no explanation of what possible conflict of interest might have prevented this trial judge from performing her duties to ensure that an accurate record be presented in this serious criminal matter. The majority simply concludes that because the judge, on her own motion and without creating any record, did recuse herself, she "was, in fact, prevented by a 'disability' from holding the hearing." The majority then also focuses on the bill of exceptions that was created as being "properly certified" by a different judge—one who had no prior history or involvement with the actual trial for which this bill of exceptions was the official record.

Court records are sacrosanct. Accuracy in the judicial review process, and public confidence and trust in the process, depends mightily on the accuracy and trustworthiness of the record presented to the appellate court. As the majority points out, if the rules and procedures governing the creation of that record are all properly followed, the record imports absolute verity when the record comes to an appellate court. See, *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *Wonderling v. Conley*, 182 Neb. 446, 155 N.W.2d 349 (1967). In *State v. Dyer, supra*, the Supreme Court was presented with an assertion by the parties on appeal that there was an error in the record and the court noted that it could decide the case only on the record presented, because amendments or corrections have to be made in the district court, pursuant to § 2-105(5). It is ironic that the majority rejects appellant's complaints about the record in this case on the basis of *State v. Dyer* when the issues before us arise out of appellant's actually doing what was supposed to be done, seeking proper amendment under § 2-105(5), but having a trial judge who delegated her duties to a substitute judge. The absolute verity afforded the record

cannot be afforded when the procedures for creation of an accurate record were not complied with because of the actions of an official court reporter and the trial judge. See *Walton v. Southern Pac. Co.*, 53 F.2d 63 (1931) (presumptions of regularity and unimpeachability of trial record not applicable if record intrinsically defective).

What happened in this case presents a serious undermining of the sanctity of judicial proceedings and public confidence in them. The court reporter in this case acknowledged having intentionally violated rules designed to ensure the accuracy and proper preparation of the court record in a criminal prosecution involving very serious charges of egregious conduct. When the court reporter was notified of errors in the record, she obtained the bill of exceptions from the court file, removed the file-stamped cover page of the bill of exceptions, shredded the remaining pages of the original bill of exceptions, created an entirely new bill of exceptions, and backdated the newly created bill of exceptions with help from an employee in the district court clerk's office. When this misconduct was brought to the attention of this court, we specifically remanded the matter for a hearing in compliance with § 2-105(5), which provides a procedure for preserving the sanctity of the record and for ensuring the accuracy of amendments and corrections to the record. That process required the trial judge, if able to do so, to preside over the hearing. She did not do so, and there is no indication in our record of why.

As a result, an evidentiary hearing was eventually conducted in front of a judge who had no familiarity with the trial proceedings and who had no basis of knowledge to properly determine whether the amendments and corrections to be made were accurate. At that hearing, appellant was represented by appellate counsel—who was different counsel than appellant's trial counsel—and the State was represented by one of the two attorneys from the Douglas County Attorney's office who had prosecuted the matter at trial. Aside from appellant and the prosecutor, the only other person present in the courtroom during this hearing who had been present

during the trial was the offending court reporter—and the court reporter was accompanied by her privately retained legal counsel.

The offending court reporter was the sole witness at the hearing. She acknowledged each action set forth above. In defending or rationalizing her actions, she testified under oath that although she had served two Douglas County District Court judges, she was not aware before this case that shredding a court record and then backdating a newly created one was improper. Although the record indicates that her original stenographic notes and original audio recording were in existence, they were never offered or presented to the substitute judge. Without any prior knowledge or history of what actually happened at trial, and without being offered or reviewing the original notes or audio, the substitute judge found that the revised bill of exceptions corrected all mistakes. It is entirely possible that the record presented to us now is accurate in every way. But there is no way of knowing that. What we do know is that serious misconduct concerning its preparation occurred after errors in the original bill of exceptions were discovered. What we also know is that if the process set forth in § 2-105(5) had been followed, the original trial judge could have determined that the current record is an accurate record of the trial she presided over. I disagree with the majority's conclusion that allowing a substitute judge to preside over the § 2-105(5) hearing without any actual record or showing of a disability on the part of the original judge can be overlooked. I would remand the matter to the district court for a properly conducted § 2-105(5) hearing by the original trial judge. The sanctity of judicial records and public confidence in the judicial process warrant this.